CITY OF CINCINNATI, APPELLANT, *v.* CINCINNATI REDS, APPELLEE.

(No. C-830063—Decided April 4, 1984.)

*Richard A. Castellini,* city solicitor, *W. Peter Heile* and *James F. McCarthy,* for appellant.

*Frost & Jacobs* and *R.O. Klausmeyer,* for appellee.

BLACK, J. The single inquiry in this appeal is whether under the lease of Riverfront Stadium from the city of Cincinnati (City) to The Cincinnati Reds (Reds), the City can recover, under any theory of law, percentage rent, admission tax, stadium use charges, or percentage share of concession sales, for that period (June 12, 1981 to August 9, 1981) when the major league baseball players were on strike and the nationally scheduled games were all cancelled. The lower court answered that inquiry in the negative. The trial court granted the Reds' motion for summary judgment and dismissed the City's complaint. We affirm.

We focus attention on the 1967 lease between the City and the preceding owner of Cincinnati's major league baseball team, a lease which is admitted-

ly binding on the Reds. The term of the lease is forty years. Set forth in forty-eight typewritten pages, it is as complete a document as could be reached prior to the construction of the stadium. It contemplates the existence of a major league football team as "co-tenant," as well as the use of the stadium by other organizations for other events. The Reds have certain parts of the stadium complex for their sole use on a year-round basis (administrative offices, main ticket office, club house, storage area, and fifty parking spaces in the stadium garage). The Reds, further, have "the exclusive right, privilege, and obligation" to use and occupy the stadium during the baseball season for regularly scheduled (or rescheduled) baseball games in accordance with the official National League schedule.[1] We believe it is unnecessary to say more about the lease other than that it contains those provisions one would expect to find in a long-term, multiple-occupancy lease, with one significant exception. The lease has no provision specifically relieving the Reds from any payment in the event of a players' strike.

The major league baseball players had never struck in the past, but on June 12, 1981, the baseball season was cancelled until further notice, by reason of a national strike called by the players' association. The schedule was not resumed until August 10, 1981. No games were played in the stadium during the strike, and twenty-six games were "lost" and never rescheduled. All other scheduled games were played. The City makes no charge of bad faith against the Reds for not playing the "lost" games.

The lease requires the Reds to make four types of payment to the City:

1. A fixed minimum rent of $175,000 per year (Section 502[1]).

2. A percentage rent of 7½ percent of all admissions in excess of $2,333,333.33 (Section 502[2]).

3. A stadium use charge of $.25 per admission (Section 506).

4. A ten percent share of gross concession receipts (Section 604).

In addition, a City ordinance imposes an admission tax.[2] During the year 1981, the Reds made the following payments to the City, based on the

---

[1] The pertinent sections of the lease providing for use and occupancy of the playing and related areas of the stadium are Sections 401 and 402:

"*Section 401.* Except as expressly provided in this lease to the contrary TENANT shall have *the exclusive right, privilege, and obligation, so long as term, to use and occupy the Demised Premises during the period of each year covered by the Baseball Season, for the purpose of conducting therein the exhibition of Major League Baseball Games on the dates (day or night) regularly scheduled or rescheduled for such baseball games in accordance with the official National League schedule* pertaining to professional baseball games to be played in the Stadium by TENANT, and also together with the following incidental uses in connection with, or pertaining to, the conduct or exhibition of such baseball games:

"The right to use the Stadium for practice and also the right to play not more than

one (1) charity game, and exhibition baseball games during each Baseball Season, but only at time when the Stadium is not used for other scheduled events approved by LANDLORD prior to TENANT'S request.

"*Section 402.* Except for TENANT'S Exclusive Demised Premises and except during the periods of TENANT'S use as provided elsewhere herein, *the LANDLORD reserves, and shall have the exclusive right to use and occupancy of the Demised Premises and to the possession thereof, and the rents, issues and profits therefrom.*" (Emphasis added.)

Section 101 defines the terms "Demised Premises," "Baseball Season," "Major Leage Baseball Games," and "National League," but since these definitions conform to the common understanding of those terms, we need not quote from Section 101.

[2] Obviously, the obligation to pay admissions tax arises under the ordinance, not the

games actually played during the 1981 season (excluding, of course, the twenty-six games "lost" during the players' strike):

| | |
|---|---:|
| Fixed minimum rent | $ 175,000.00 |
| Percentage rent | 286,711.01 |
| Stadium use charges | 350,372.75 |
| Share of concession receipts | 392,751.34 |
| Admissions tax | 167,786.57 |
| TOTAL PAID IN 1981 | $1,372,621.67 |

We note that the Reds paid in full the fixed minimum rent for the year 1981, and that the City does not contest the computation of the other amounts actually paid. However, the City filed the instant action to recover the payments it claims the Reds should have made for the twenty-six "lost" games during the strike, for percentage rent, stadium use charges, and share of concession receipts. We will sometimes refer to these as "the contingent payments," as a matter of convenience. The complaint has three counts: breach of express contract to use the stadium throughout the baseball season; breach of the indemnity clause[3]; and breach of a quasi-contract, or unjust enrichment. On appeal from the dismissal of its complaint, the City presents the single assignment of error that the court erred in granting the Reds' motion for summary judgment. The City contends that it has a right to relief under theories of express contract, implied obligation to pay rent, and quasi-contract or unjust enrichment. We find no merit in the assignment of error under any theory.[4]

The City has no right to relief for breach of an express contract, because there was no breach. The Reds made all of the 1981 payments required by the lease: the fixed annual minimum rental was paid in full for the year, and those payments that are calculated from ticket sales, attendance and concession sales (the contingency payments) were fully paid for those games that were actually played in 1981. The lease does not require more than that. The Reds were entitled and required to use the stadium for major league baseball games regularly scheduled or rescheduled in accordance with the official National League schedule. Under the clear and unequivocal terms of the lease, if some or all of the games under the National League schedule were cancelled in whole or in part, none of the contingency payments would be payable, for the simple reason that no ticket sales, admissions or concession sales would

---

lease. The city makes no claim that any admissions tax is due for the "lost" games.

[3] The count claiming breach of the indemnity clause in the lease apparently refers to Section 902, which reads:

"*Section 902.* From and after the effective date of this lease, TENANT shall indemnify and save harmless the LANDLORD from and against any and all liabilities, losses, damages, costs, expenses, causes of action, suits, judgments and claims *by others* arising from any failure by TENANT to perform any of the agreements, terms, covenants or conditions of this lease on TENANT'S PART to be performed." (Emphasis added.)

The City's brief on appeal does not press the claim of breach of this clause, and although it may be deemed to have been

waived, we take note of it, and reject the claim, because the plain and unequivocal intent of the clause is to save the City harmless not from defaults by the Reds in performing their obligations under the lease, but from claims, etc., by third parties.

[4] In its brief on appeal, the City also presents the argument that summary judgment was in error because there are genuine issues of material fact about the intentions and obligations of the parties, but this contention was not pressed in oral argument. To the contrary, counsel for the City conceded orally that there are no genuine issues of material fact. We have made an independent review of the record and find no genuine issues of the material facts.

have been generated by the cancelled games. The lease did not give the Reds the exclusive use of playing (exhibition) areas of the stadium for the entire length of the baseball season, but only for the regularly scheduled games. The City reserved those areas for all those times when the Reds had no scheduled games. For instance, if a regularly scheduled game was cancelled because of the weather and never rescheduled by the National League in this stadium, the City would have no claim for the contingent payments. In sum, under the clear language of the lease, reasonable minds could only conclude that the risk of loss from the unavoidable, faultless cancellation of games was to be shared, in the sense that the Reds lost all revenue normally derived from games and the City lost all payments contingent on that revenue.

The City has no right to relief for the breach of an implied obligation to continue to make the contingent payments even though the players were on strike, for the reason that the language of the lease will not support any such implication. As already noted, the express contract between the parties provided for the contingent payments only when games were played in the stadium; this is the clear and unmistakable expression of the intent of the parties. Implied obligations can only arise when this is necessary to carry out the expressed intent of the parties. As stated in the first paragraph of the syllabus of *Kachelmacher* v. *Laird* (1915), 92 Ohio St. 324:

"There can be no implied covenants in a contract in relation to any matter that is specifically covered by the written terms of the contract itself."

The implication must come from the express language chosen by the parties. *Cronin* v. *Greenwald* (1952), 92 Ohio App. 216 [49 O.O. 328]. Two maxims come to mind: (1) *expressio unius est exclusio alterius,* or the expression of one thing implies the exclusion of another

thing; (2) *expressum facit cessare tacitum,* or the express declaration puts to an end anything which silence might imply. *Creighton* v. *Toledo* (1869), 18 Ohio St. 447, syllabus. The language of the lease negates the implication of any continuing obligation to make any contingent payments with respect to the "lost" games.

The City has no right to relief for breach of a quasi-contract, or for unjust enrichment, for the reason that no duty arose by law under the facts of this case that would require the Reds to pay to the City amounts over and beyond those agreed to in the lease. A quasi-contract is not built on the intention of the parties, but on a duty imposed by law on one who would otherwise be unjustly enriched at the cost of another. The law indulges in the fiction of a contract implied in law, in order to enforce a legal duty by an action in form *ex contractu* but in reality in the nature of a bill in equity. *Paramount Film Distributing Corp.* v. *Tracy* (Franklin C.P. 1960), 86 Ohio Law Abs. 225, 243, affirmed (1962), 118 Ohio App. 29 [24 O.O.2d 362], affirmed (1963), 175 Ohio St. 55 [23 O.O.2d 352]. The third paragraph of the syllabus of *Rice* v. *Wheeling Dollar Savings & Trust Co.* (1951) 155 Ohio St. 391 [44 O.O. 374], reads:

"A quasi contract is an obligation imposed by law whereby civil liability arises as to one who has received benefits which he is not justly entitled to retain and for which he may be made to respond in an action in the nature of assumpsit."

In the instant case, the Reds were not enriched at the cost of the City; the only reasonable implication from the evidence is that the Reds suffered economic loss from the strike, at least to the same extent of the City, if not to a much greater extent. We are not impressed with the claim that because the City held the stadium available for any games the Reds might have played during the

suspension of the national schedule, the Reds were somehow "enriched"; we find no proof of enrichment, and every implication is to the contrary. Finally there is a principle that the theory of quasi-contract or unjust enrichment is not available when an express contract will afford the complainant the same recovery. *Randolph* v. *New England Mut. Life Ins. Co.* (C.A. 6, 1975), 526 F.2d 1383, 1387.

Finding no error, we affirm.

*Judgment affirmed.*

PALMER, P.J., and DOAN, J., concur.