[Cite as *Bunta v. Mast*, 2020-Ohio-5500.]

COURT OF APPEALS
HOLMES COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| VASILE BUNTA | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 20CA006 |
| | : | |
| FIRMAN D. MAST | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Holmes County Court of Common Pleas, Case No. 2017 CV 030

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      December 2, 2020

APPEARANCES:

For Plaintiff-Appellee:

THOMAS D. WHITE
MATTHEW A. KEARNEY
209 N. Washington St.
Millersburg, OH 44654

For Defendant-Appellant:

GRANT A. MASON
The Lincoln Building
88 S. Monroe St.
Millersburg, OH 44654

*Delaney, J.*

{¶1} Defendant-Appellant Firman D. Mast appeals the February 21, 2020 judgment entry of the Holmes County Court of Common Pleas journalizing the jury verdict in favor of Plaintiff-Appellee Vasile Bunta.

## FACTS AND PROCEDURAL HISTORY

## Creation of Superior VacuPress, LLC

{¶2} In December 2013, Plaintiff-Appellee Vasile Bunta and Defendant-Appellant Firman D. Mast were introduced during a long car trip to Kansas. Firman Mast owned a successful roofing business located in Holmes County, Ohio. Bunta, an electrical engineer, worked for Mt. Eaton Lumber company and operated his own lumber exporting business named Dim X-Port, LLC. Dim X-Port purchased lumber from companies in Ohio and sold the lumber to foreign markets. During the car ride, Bunta explained to Firman Mast the concept of drying lumber with vacuum kilns. When trees are cut for lumber, they are full of moisture. To prevent the cut lumber from splitting and warping, it is dried. The lumber can be air dried which can take months and can lead to increased splitting and warping. If the cut lumber is placed in a vacuum kiln, the heat and vacuum from the kiln pulls the moisture from the lumber, requiring less drying time and less warping or splitting.

{¶3} In January 2014, Bunta and Firman Mast entered into an oral agreement to purchase a vacuum kiln and start a wood drying business named Superior VacuPress, LLC ("VacuPress"). Bunta did most of the planning, which included the plant layout, electrical design, and business plan. Bunta introduced Firman Mast to Jim Parker, Bunta's contact at Vacutherm, where VacuPress was going to purchase the vacuum kiln. The

VacuPress building was going to be built on the property of Defendant Dennis Mast, Firman Mast's father.

{¶4}   Firman Mast and Bunta consulted with Commercial and Savings Bank to obtain financing. The bank recommended that Bunta not be a partner in VacuPress due to his credit issues. Bunta was a Romanian immigrant, educated in the United States and a green card holder. As Bunta was working on establishing VacuPress, he did not focus on Dim X-Port. In 2015, Dim X-Port experienced financial difficulties due to foreign market instability in lumber. As a result, Dim X-Port was unable to fully pay its outstanding balances to the lumber companies. One company, DY Lumber, understood the basis for Dim X-Port's outstanding bills was market instability and allowed it make installments on the balance.

{¶5}   To secure the bank financing for VacuPress, Dennis Mast co-signed the loans with Firman Mast. Commercial and Savings Bank made five loans totaling $1,433,000 and opened a $200,000 credit line to VacuPress.

{¶6}   The original operating agreement for VacuPress was signed in April 2014. The initial members of VacuPress were Firman Mast at 85% interest and Dennis Mast for 15% interest (in exchange for his co-signing the loan and providing the land). Firman Mast was the manager of VacuPress.

{¶7}   The vacuum kiln purchased from Vacutherm was installed from June 2014 to November 2014. The kiln went into operation in December 2014. Dennis Mast was hired by VacuPress to load the vacuum kiln. Mervin Mast, Firman's brother, was hired as the bookkeeper and salesperson. Both Dennis and Mervin earned a salary from VacuPress.

{¶8}   In January 2015, Firman Mast and Bunta entered into an agreement that for the first six months of operation, he and Bunta would not be paid. At month 12 and if VacuPress was earning money, Firman Mast and Bunta would draw $2000 per month. At month 18, Firman Mast and Bunta would draw $4000 per month.

**Operation of Superior VacuPress**

{¶9}   In February 2015, Bunta and Firman Mast formed the Ohio Vacupress Association, dba, Vacutherm Midwest, LLC ("Vacutherm"), based on their relationship with Jim Parker. Bunta was the 51% owner and Firman Mast was the 49% owner. The purpose of Vacutherm Midwest was to receive commissions from the sales of Vacutherm vacuum kilns.

{¶10} Firman Mast issued a capital call of $109,000 to the members of VacuPress in September 2015. Bunta was included in the capital call even though he was not a member of VacuPress. On October 19, 2015, Bunta used funds from Dim X-Port and paid VacuPress $10,000. On December 8, 2015, Bunta used his interest from Vacutherm to pay $22,175.90 to VacuPress.

{¶11} On January 1, 2016, the members executed an Amended and Restated Operating Agreement for VacuPress that included Bunta as a 30% member. Firman Mast was manager and 45.9% owner, Dennis owned 13.5%, and Mervin owned 10.6%.  Based upon Bunta's 30% interest, he was responsible for 30% of the capital call.

{¶12} Bunta paid $3,060 to VacuPress from his interest in Vacutherm on March 2, 2016. Bunta overpaid his portion of the capital call by $1,882.00.

{¶13} Firman Mast called a member's meeting on March 22, 2016. The purpose of the meeting was to discuss the financial difficulties facing VacuPress. Firman Mast,

Dennis, and Mervin confronted Bunta about the inability of VacuPress to purchase lumber from local lumber mills. They argued that due to Bunta's outstanding debts to local lumber mills, the mills would not do business with VacuPress. The Masts encouraged Bunta to settle his debts with the lumber mills. Firman Mast and Bunta had not received any compensation from VacuPress. Prior to the meeting, Bunta told Firman Mast that he wanted to be paid for the work he performed in creating VacuPress in 2014 and 2015. Firman Mast told him to provide invoices so Bunta brought invoices from Dim X-Port totaling $26,000 to the meeting. Bunta issued the invoices from Dim X-Port for tax purposes. The members agreed that VacuPress should pay Bunta $6,000. Bunta admitted at the meeting that he wanted to exit VacuPress.

{¶14} After the meeting, Bunta stopped actively working for VacuPress. Firman, Dennis, and Mervin agreed that they needed to move forward with the business without Bunta.

{¶15} In June 2016, Firman Mast made a first attempt to remove Bunta from VacuPress when he sent him a letter demanding payment of Bunta's share of the capital call with a penalty of a 24.9% interest rate.

{¶16} Firman Mast and Bunta dissolved Vacutherm Midwest. Firman Mast created FM, LLC to receive commissions from the sales of Vacutherm vacuum kilns. Firman Mast and his wife were the owners of FM, LLC.

{¶17} In July 2016, Firman Mast offered Bunta $20,000 as a buyout option. Bunta did not accept.

**Creation of Superior Lumber**

{¶18} On August 15, 2016, Firman Mast sent the members of VacuPress a notice of dissolution. On November 1, 2016, Firman Mast created Defendant Superior Lumber, LLC with Firman Mast owning 51% interest, Dennis 15% interest, and Mervin 34% interest. Firman Mast transferred the assets and debts from VacuPress to Superior Lumber. In December 2016, Firman Mast wrote a letter to the shareholders of VacuPress stating that due to financial difficulties, VacuPress would cease operations. On January 19, 2017, the Ohio Secretary of State received notification that VacuPress had been dissolved. Superior Lumber began operations on January 1, 2017.

{¶19} The 2017 tax return for Superior Lumber showed its gross receipts were $1,735,752.00 and its gross profits were $347,153.

**Civil Action**

{¶20} On June 15, 2017, Bunta filed a complaint against VacuPress, Firman Mast, Mervin, Dennis, and Superior Lumber ("Mast defendants"). Bunta also named Commercial and Savings Bank ("CSB") as a defendant to the complaint.

{¶21} The thrust of Bunta's argument was that he was not compensated when Firman Mast dissolved VacuPress. Bunta asserted the following counts in his complaint: (1) declaratory judgment against the Mast defendants and Superior Lumber determining the Mast defendants abandoned VacuPress in favor of Superior Lumber with a determination that the parties are no longer bound to the operating agreement of VacuPress; (2) a declaration that VacuPress is dissolved and requiring the Mast defendants to fully account for VacuPress; (3) accounting by VacuPress and the Mast defendants for all monies received and disbursed by them; (4) breach of fiduciary duty by

the Mast defendants; (5) civil conspiracy by VacuPress, Superior Lumber, and the Mast defendants to breach the fiduciary duty owed to appellee and/or conversion of appellee's property; (6) conversion by VacuPress, Superior Lumber, and the Mast defendants; and (7) unjust enrichment by VacuPress, Superior Lumber, and the Mast defendants. Bunta requested the following relief: a declaratory judgment that the Mast defendants abandoned VacuPress and the parties are no longer bound by the operating agreement, judicial dissolution, accounting, and winding up of VacuPress, and an award of compensatory damages. Bunta did not name CSB in any of the counts, nor did he request relief from CSB. Rather, Bunta only asserted that CSB "may have an interest in the subject matter of this case."

{¶22} The Mast defendants filed an answer denying the allegations in the complaint and asserting as their first affirmative defense that the Amended and Reinstated Operating Agreement contained a binding arbitration clause. On July 27, 2017, the Mast defendants filed a motion to stay proceedings and refer the matter to arbitration. On November 17, 2017, the trial court issued a judgment entry denying the motion to stay the proceedings and arbitration request. The Mast defendants appealed the matter to this Court in *Vasile Bunta v. Superior VacuPress LLC*, 2018-Ohio-2823, 117 N.E.3d 51 (5th Dist.). On July 13, 2018, we affirmed the trial court's decision to deny the motion to stay.

{¶23} On October 4, 2019, the Mast defendants filed motions for summary judgment. Bunta responded. The trial court held an oral hearing on the motions.

{¶24} On November 14, 2019, Bunta dismissed three counts of his complaint: (1) declaratory judgment against the Mast defendants and Superior Lumber determining the

Mast defendants abandoned VacuPress in favor of Superior Lumber with a determination that the parties are no longer bound to the operating agreement of VacuPress; (2) a declaration that VacuPress is dissolved and requiring the Mast defendants to fully account for VacuPress; and (3) accounting by VacuPress and the Mast defendants for all monies received and disbursed by them.

{¶25} On December 5, 2019, the trial court denied the motions for summary judgment. Bunta voluntarily dismissed VacuPress as a defendant.

{¶26} The remaining Mast defendants filed a Motion in Limine on February 4, 2020. The Mast defendants argued Bunta's expert witness, Michael Oesch should be excluded. Oesch, a certified public account, was to testify as to the financials of VacuPress and Superior Lumber. The trial court held a hearing on the motion on February 10, 2020 and denied the motion.

{¶27} The matter proceeded to a three-day jury trial. During the trial, Firman Mast made multiple motions for directed verdict, which the trial court denied. Mervin Mast was dismissed as a defendant. The matter was submitted to the jury with interrogatories. The jury returned verdicts against only Firman Mast on (1) Count Six, Conversion and awarded damages in the amount of $231,854.50 and (2) Count Seven, Unjust Enrichment and awarded damages in the amount of $45,000. The trial court journalized the verdict on February 21, 2020. It is from this judgment Firman Mast now appeals.

**ASSIGNMENTS OF ERROR**

{¶28} Firman Mast raises three Assignments of Error:

{¶29} "I. THE TRIAL COURT ERRED BY DENYING APPELLANT FIRMAN MAST'S MOTION FOR SUMMARY JUDGMENT AND SUBSEQUENT MOTIONS FOR DIRECTED VERDICT ON APPELLEE'S CLAIM FOR CONVERSION.

{¶30} "II. THE TRIAL COURT ERRED BY DENYING APPELLANT FIRMAN MAST'S MOTION FOR SUMMARY JUDGMENT AND SUBSEQUENT MOTIONS FOR DIRECTED VERDICT ON APPELLEE'S CLAIM FOR UNJUST ENRICHMENT.

{¶31} "III. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY PERMITTING APPELLEE'S EXPERT WITNESS TO TESTIFY AND SUBMIT HIS DAMAGES VALUATION REPORT TO THE JURY."

**ANALYSIS**

**I. CONVERSION**

{¶32} Bunta claimed that Firman Mast committed the tort of conversion over Bunta's 30% interest in VacuPress when Firman Mast dissolved VacuPress and created Superior Lumber. Firman Mast contends in his first Assignment of Error that the trial court erred when it failed to find as a matter of law, through summary judgment or directed verdict, that Bunta had no claim for conversion. We disagree.

**Standard of Review**

{¶33} Firman Mast challenged Bunta's claim for conversion on two fronts: summary judgment and directed verdict. Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 36, 506 N.E.2d

212 (1987). As such, this Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

{¶34} Civ.R. 56 provides summary judgment may be granted only after the trial court determines: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).

{¶35} Similar to a Civ.R. 56 motion for summary judgment, a motion for a directed verdict can only be granted if, after construing the evidence most favorably to the nonmoving party, reasonable minds could come to but one conclusion upon the evidence submitted. Civ.R. 50(A)(4); *Ohio Cas. Ins. Co. v. D&J Distrib. & Mfg., Inc.*, 6th Dist. Lucas No. L-08-1104, 2009-Ohio-3806, ¶ 29.

**The Tort of Conversion**

{¶36} The tort of conversion is defined as "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Heflin v. Ossman*, 5th Dist. Fairfield No. 05CA17, 2005–Ohio–6876, ¶ 20, quoting *Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990). Thus, the elements required for conversion are: (1) a defendant's exercise of dominion or control; (2) over a plaintiff's property; and (3) in a manner inconsistent with the plaintiff's rights of ownership. *Id.*, citing *Cozmyk Ent., Inc. v. Hoy*, Franklin App. No. 96APE10–1380, 1997 WL 358816 (June 30, 1997).

{¶37} Firman Mast raises two arguments as to why Bunta's claim for conversion must fail. First, he contends existing Ohio law does not recognize a claim of conversion over intangible assets. Second, assuming arguendo the claim of conversion over intangible assets is not barred as a matter of law, Firman Mast states that Bunta failed in meeting his evidentiary burden to demonstrate his damages.

### Can Bunta's Membership Interest be Converted?

{¶38} In this case, Bunta claimed that Firman Mast converted his 30% membership interest in VacuPress when Firman created Superior Lumber, dissolved VacuPress, and transferred the VacuPress assets and debts to Superior Lumber. The uncontroverted evidence at trial showed that Bunta was a 30% member of VacuPress, Firman Mast dissolved VacuPress and transferred all the assets and debts from VacuPress to Superior Lumber, and Bunta was not a member of Superior Lumber. In closing arguments, Bunta requested damages in the amount of $516,097.00 for the totality of his claims. Interrogatories were submitted to the jury. On Interrogatory 11, the jury found by a preponderance of the evidence that Firman Mast converted property that was owned by Bunta for which he had the right to possess and Bunta suffered damages in the amount of $231,854.50.

{¶39} Firman Mast argues Bunta's claim for conversion is barred as a matter of law because Ohio law unilaterally limits conversion claims to those based on the taking of tangible, personal property. He states the property allegedly converted by Firman Mast was monies due under the Amended and Restated Operating Agreement, which is not identifiable and tangible personal property. The issue before the Court is whether Bunta's

30% membership interest in VacuPress can be converted. We examine the case law addressing the conversion of intangible assets.

{¶40} The Ohio Supreme Court addressed the issue of conversion and intangible property in *Zacchini v. Scripps–Howard Broadcasting Co.*, 47 Ohio St.2d 224, 227, 351 N.E.2d 454 (1976). The intangible asset at issue in *Zacchini* was the plaintiff's image. Zacchini was a "human cannonball" and had been filmed by a television station, which showed the clip during a news program. Zacchini sued, alleging as part of his claims the invasion of privacy by appropriating his professional talents. The trial court granted summary judgment and the appellate court reversed, finding Zacchini stated a claim for conversion. The matter was appealed to the Ohio Supreme Court where it rejected Zacchini's claims. The Court stated as to conversion:

> Conversion is a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights. *Railroad Co. v. O'Donnell* (1892), 49 Ohio St. 489, 497, 32 N.E. 476. Although the original rule at common law was that only tangible chattels could be converted, it is now generally held that intangible rights which are customarily merged in or identified with some document may also be converted. Examples include drafts, bank passbooks, and deeds. See Prosser, The Law of Torts (4th ed. 1971), at pages 81-82. See, generally, Annotation, 44 A.L.R.2d 927. But conversion does not apply to any intangible right, and certainly it has never been held that one's countenance or image is 'converted' by being photographed. The difficulties with any such holding are apparent. 'Taking' a photograph of

someone does not in fact take anything from that person. If the photograph or film is only a conversion when shown to others, we may well ask to how many others it must be shown, and how often, before it becomes actionable. The distinguishing characteristic of conversion is the forced judicial sale of the chattel or right of which the owner has been wrongfully deprived. In the case of such intangible quasi-proprietary rights as are involved here, a forced sale would be largely absurd, because of the doubtfulness of determining what has been 'taken.' Is it the right to perform the act, to view it, to present it on television, to license its filming, or some other right? Judicial ingenuity could perhaps award damages and find a res said to be sold. But to extend the ambit of conversion to rights such as those claimed by plaintiff, which are more appropriately considered under wholly distinct legal principles, is confusing, unnecessary, and improper.

(Citations omitted.) *Zacchini* at 226–27.

{¶41} The Second District Court of Appeals reviewed a conversion claim regarding intangible property in *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 283, 741 N.E.2d 155 (2000). *Schafer* involved a partnership wherein a majority of partners had issued a capital call, which they were entitled to do under the terms of the partnership agreement. However, the majority partners had issued the capital call for a wrongful purpose, to reduce the minority partner's partnership interest and squeeze the him out of the partnership. The minority partner sued the majority partners, claiming in part conversion of his partnership interests. The majority partners argued the claim for conversion was barred because Ohio law did not recognize conversion of intangible

assets. The *Schafer* court concluded the minority partner was entitled to make a claim for conversion of his partnership interest:

> [C]onversion was an appropriate basis for recovery in the present case. Specifically, Schafer had an undisputed interest of twenty-five percent in [the partnership] before the capital call. * * * Based on the alleged wrongful acts of the defendants, Schafer lost nineteen percent of his property interest and the defendants' asserted control over the property, in opposition to Schafer's claim.

*Id.* at 285, 741 N.E.2d 155.

{¶42} In its analysis of the case law regarding conversion, the Second District did not find any cases unilaterally prohibiting conversion claims based on intangible assets. *Id.* at 285. "[T]he Ohio Supreme Court has not rejected conversion as a potential cause of action for all intangible assets." *Id.* at 284. The Second District believed "the correct approach is to analyze the particular type of intangible asset, to see if allowing a conversion claim makes sense." *Id.* at 285.

{¶43} In support of his argument that Bunta's claim for conversion is barred as a matter of law, Firman Mast cites this Court to *Landskroner v. Landskroner*, 154 Ohio App.3d 471, 2003–Ohio–4945, 797 N.E.2d 1002 (8th Dist.). In *Landskroner*, father and son attorneys had entered into practice together but there was no written agreement between the parties. The father stated he transferred his interest in the law firm to the son contingent upon his receiving fair distributions from the law firm. Subsequently, the son advised the father that he was ending their business relationship and vacated the office space they shared, taking with him all the employees and business equipment. The father

filed a lawsuit against the son which included a claim for conversion. The trial court dismissed the case and the Eighth District Court of Appeals affirmed.

{¶44} The father claimed the law firm "obtained possession of monies" belonging to him and converted those funds for its own use in contravention of the parties' agreement. *Id.* at ¶ 26. The Eighth District noted that " 'existing law generally allows actions for conversion to be based only upon the taking of identifiable, tangible personal property.' " *Id.* at ¶ 27, citing *Wiltberger v. Davis*, 110 Ohio App.3d 46, 55, 673 N.E.2d 628 (10th Dist.1996). The court then went on to find the father's conversion claim was "not identifiable, personal property but rather comprise[d] monies" the father claims were due and owing him under an agreement. *Id.* at ¶ 27.

{¶45} Upon examination of *Zacchini*, *Schafer*, and *Landskroner*, we do not agree with Firman Mast's argument that Ohio law unilaterally prohibits conversion claims based on intangible assets. Determining whether the property can be the subject of a conversion action is not a bright line test – the determination is nuanced and to be decided based upon the characteristics of the alleged converted property. *Schafer, supra* at 285. The appropriate questions to ask are is the property intangible and if so, is the intangible property identifiable?

{¶46} In *Landskroner*, the problem with the father's conversion claim was not that money was the basis of the claim but that the father could not identify any money to which he was due. *Heartland Fed. Credit Union v. Horton*, 2nd Dist. Montgomery No. 25412, 2013-Ohio-2931, ¶ 31. This stemmed from his failure to attach to the complaint any contract or agreement which might have specified the sums which he was due. In

contrast, the partnership interest that was converted in *Schafer* was specifically identifiable.

{¶47} A conversion claim based on intangible property was permitted in *Fifth Third Bank v. Cooker Rest. Corp.*, 137 Ohio App.3d 329, 738 N.E.2d 817 (1st Dist.2000). Cooker entered into a Bank Card Merchant Agreement with Fifth Third Bank for it to provide credit-card processing services for its restaurants. Cooker relocated its headquarters and returned the credit-card processing equipment to Fifth Third. Meanwhile, one of Cooker's restaurants accidentally reprogrammed its processing equipment and transmitted over $50,000 in payments to Fifth Third. Fifth Third kept those funds and demanded more as liquidated damages for what it perceived as a breach of the Bank Card Merchant Agreement. Fifth Third sued Cooker for breach of contract and Cooker counterclaimed for conversion. The First District Court of Appeals affirmed a verdict in favor of Cooker on its claim for conversion. The claim was permitted because the money converted was specifically identifiable. *Heartland Fed. Credit Union, supra* at ¶ 31.

{¶48} In the present case, Bunta claims the conversion of his 30% membership interest in VacuPress when Firman Mast dissolved VacuPress and transferred the assets and debts to Superior Lumber. There is no dispute the property Bunta claims is intangible; therefore, the next question is the property identifiable? Bunta's expert at trial, Michael Oesch testified that based on the financial records he examined, the assets and debts of VacuPress were transferred to Superior Lumber. John Cook, expert for Firman Mast, testified that Firman did not liquidate VacuPress, he rolled the assets into Superior Lumber. On a personal financial statement prepared by Firman Mast in August 2017 for

the Home Loan Savings Bank, Firman Mast stated the value of his share of Superior Lumber was $850,000. Oesch extrapolated from the personal financial statement that the total value of Superior Lumber was $1,670,000. From the value of Superior Lumber as stated in Firman's personal financial statement, Oesch testified Bunta's 30% interest would be $500,000. Oesch testified he also conducted an analysis of different financial records and estimated the company value was $1,720,322, wherein the value of Bunta's portion was $516,097. The jury ultimately awarded Bunta $231,854.50 on his claim for conversion. Firman Mast has not raised an Assignment of Error contesting the amount the jury awarded Bunta on his claim for conversion.

{¶49} In this case, we find that Bunta's claim for conversion is not unilaterally barred as a matter of law. The facts of the case are comparable to *Schafer* wherein the property claimed, while intangible, was identifiable.

**Did Bunta Prove All Elements of Conversion?**

{¶50} Firman Mast next contends that Bunta failed to produce evidence on all elements of conversion. Specifically, Firman argues that Bunta did not produce evidence of damages at the time of the alleged conversion. Firman Mast requested a directed verdict in his favor on this issue at trial.

{¶51} A judgment for conversion generally imposes the fiction of a "forced judicial sale" and requires the defendant to pay the full value of the converted property. *Schafer v. RMS Realty, Inc.*, 2nd Dist. Montgomery No. 21869, 2007-Ohio-7155, ¶ 67 citing *Acheson v. Miller*, 2 Ohio St. 203 (1853); *Conley v. Caudill*, 4th Dist. Pike No. 02CA697, 2003-Ohio-2854, ¶ 8 n. 2. As stated in *Acheson*: "The party [plaintiff] in effect abandons his property, as of that time, to the wrong-doer, and proceeds for its value; so that, when

judgment is obtained and satisfaction made, the property is vested in the defendants, by relation, as of the time of the taking or conversion." *Schafer, supra* at ¶ 67. The measure of damages in a conversion action are thus determined by the value of the property at the time of the conversion. *Kademian v. Marger*, 2nd Dist. Montgomery No. 24256, 2012-Ohio-962, 2012 WL 762316, ¶ 84 citing *Brumm v. McDonald & Co. Securities, Inc.*, 78 Ohio App.3d 96, 104, 603 N.E.2d 1141 (4th Dist.1992).

{¶52} Firman Mast notified the members that VacuPress was ceasing operations in 2016. Superior Lumber was formed on November 1, 2016 and the operating agreement signed on December 31, 2016. The dissolution paperwork for VacuPress was filed with the Ohio Secretary of State on January 19, 2017. Firman Mast argues that if acts constituting conversion took place, they took place at the time the Superior Lumber began operating and the transfer of assets and liabilities took place. He states that no valuation of VacuPress as of December 31, 2016 took place.

{¶53} Bunta responds that the uncontroverted evidence demonstrated that Firman Mast transferred the assets and liabilities of VacuPress to Superior Lumber. He dissolved VacuPress but he according to Firman's expert, he did not liquidate VacuPress. Bunta was not claiming a 30% ownership interest in Superior Lumber but argued to the jury that because Firman Mast transferred VacuPress assets to Superior Lumber, Superior Lumber was fundamentally VacuPress. The measure of his conversion damages, therefore, was 30% of the value of Superior Lumber.

{¶54} A motion for a directed verdict and summary judgment can only be granted if, after construing the evidence most favorably to the nonmoving party, reasonable minds could come to but one conclusion upon the evidence submitted. Reviewing the facts of

this case in a light most favorable to Bunta, the nonmoving party, we find that reasonable minds could come to differing conclusions as to the damages for conversion. Bunta presented evidence at trial demonstrating that Firman Mast transferred the assets and liabilities of VacuPress to Superior Lumber for the purpose of squeezing out Bunta as a member. The only difference between VacuPress and Superior Lumber was that Bunta was not a member.

{¶55} Upon our de novo review, we find that Bunta's claim for conversion was not barred as a matter of law and he presented genuine issues for the finders of fact to consider. The jury found Bunta's arguments persuasive that Firman Mast exercised dominion or control over Bunta's 30% membership interest in a manner inconsistent with the Bunta's rights of ownership, for which he suffered damages.

{¶56} Firman Mast's first Assignment of Error is overruled.

## II. UNJUST ENRICHMENT

{¶57} Prior to trial, Firman Mast moved for summary judgment on Bunta's claim for unjust enrichment, which the trial court denied. Firman Mast renewed his argument at trial and moved for directed verdict on the claim, which was likewise denied. The jury found in favor of Bunta on his claim for unjust enrichment and awarded damages in the amount of $45,000.

{¶58} Firman Mast contends in his second Assignment of Error that the trial court erred by denying his motions for summary judgment and directed verdict on Bunta's claim for unjust enrichment. In our analysis of the first Assignment of Error, we outlined the standard of review for considering a motion for summary judgment and directed verdict and we use the same criteria when considering his arguments as to unjust enrichment.

**Tort of Unjust Enrichment**

{¶59} To establish an unjust enrichment claim, the plaintiff must demonstrate: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Mun. Services Corp. v. Hall Community Dev. LLC*, 5th Dist. Tuscarawas No. 2018 AP 12 0042, 2019-Ohio-3079, 2019 WL 3458731, ¶ 25 citing *Robinette v. PNC Bank*, 5th Dist. Licking No. 15-CA-47, 2016-Ohio-767, 2016 WL 771319, ¶ 23 citing Hambleton v. R.G. Barry Corp., 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984). Under Ohio law, unjust enrichment is a claim under quasi-contract law that arises out of the obligation cast by law upon a person in receipt of benefits that he is not justly entitled to retain. *FedEx Corp. Services, Inc. v. Heat Surge*, LLC, 5th Dist. Stark, 2019-Ohio-217, 131 N.E.3d 397, ¶ 1 citing *Beatley v. Beatley*, 160 Ohio App.3d 600, 2005-Ohio-1846, 828 N.E.2d 180.

{¶60} A plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject. *Lehmkuhl v. ECR Corp.*, 5th Dist. Knox No. 06 CA 039, 2008-Ohio-6295, 2008 WL 5104747, ¶ 55 citing *Ullmann v. May* 147 Ohio St. 468, 72 N.E.2d 63 (1947), syllabus four; *City of Cincinnati v. Cincinnati Reds* 19 Ohio App.3d 227, 483 N.E.2d 1181 (1984). However, while a party "may not recover for the same services under both a contractual claim and a claim for quantum meruit, a party is not barred from seeking alternative theories and recovering under a quantum meruit theory if his contractual claim fails." *Mun. Services Corp. v. Hall*

*Community Dev. LLC*, 5th Dist. Tuscarawas No. 2018 AP 12 0042, 2019-Ohio-3079, 2019 WL 3458731, ¶ 22 quoting *FedEx Corp. Services, Inc. v. Heat Surge, LLC*, 5th Dist. Stark No. 2018CA00026, 2019-Ohio-217, 2019 WL 328599, ¶ 19 citing *Building Industry Consultants, Inc. v. 3M Parkway, Inc.*, 182 Ohio App.3d 39, 2009-Ohio-1910, 911 N.E.2d 356, ¶ 17 (9th Dist.).

{¶61} We consider Firman Mast's assigned errors as to summary judgment and directed verdict together because they are premised on the same argument that he is entitled to judgment as a matter of law on Bunta's claim for unjust enrichment because Bunta could not set forth any facts entitling him to relief.

### What were the Alleged Benefits Conferred?

{¶62} First, Firman Mast contends Bunta failed to identify any benefits that he conferred upon Firman Mast, VacuPress, or Superior Lumber. Bunta responds that the record shows that Bunta conferred benefits upon Firman Mast in the creation and establishment of VacuPress and later, the creation of Superior Lumber. Reviewing the evidence in a light most favorable to Bunta, we find the jury could conclude that Bunta conferred benefits upon Firman Mast. Before the start of VacuPress, Firman Mast was a roofer and Bunta was an engineer in the lumber business, with his own lumber exporting company. The genesis of VacuPress was a long car trip, where Bunta told Firman about the business of drying lumber with vacuum drying kilns. Prior to Bunta's introduction, Firman Mast had no knowledge of the vacuum kiln. Bunta introduced Firman to Jim Parker, Bunta's vacuum drying kiln contact. After deciding to go into business together, Bunta drew up the business plan and the plant layout. VacuPress was formed, which Firman Mast used to create Superior Lumber.

{¶63} Prior to the March 22, 2016 meeting, Bunta told Firman Mast that he wanted to be paid for the work he performed for VacuPress in 2014 and 2015. Firman Mast told him to provide invoices, so Bunta brought invoices from Dim X-Port totaling $26,000 to the meeting. Bunta issued the invoices from Dim X-Port for tax purposes. The Mast defendants agreed to pay Bunta $6,000.

{¶64} The record in this case shows that Bunta used his technological knowledge and business expertise to assist Firman Mast in the creation of VacuPress, for which Bunta expected future compensation as a member of VacuPress, but received nothing when he was squeezed out of VacuPress.

### When were the Alleged Benefits Conferred?

{¶65} Firman Mast next argues that regardless of the benefits allegedly conferred upon Firman Mast, Bunta's claims for unjust enrichment are barred because the relationship between the parties was governed by the terms of the Amended and Restated Operating Agreement.

{¶66} Bunta and Firman Mast met in December 2013 and they first discussed the concept of vacuum drying lumber and in January 2014, Bunta and Firman Mast began the purchase of a vacuum kiln and start a wood drying business named Superior VacuPress, LLC. The original operating agreement for VacuPress was signed in April 2014 and Bunta was not a member. On January 1, 2016, the members executed an Amended and Restated Operating Agreement for VacuPress and Bunta was a member.

{¶67} The evidence in this case could have caused reasonable minds to come to differing conclusions as to whether Bunta conferred some benefits upon Firman Mast before they entered the Amended and Restated Operating Agreement. The jury found in

favor of Bunta on his claim for unjust enrichment and valued the benefits conferred upon Firman Mast by Bunta in the amount of $45,000. Firman Mast did not contest the amount of the jury verdict on appeal.

{¶68} Firman Mast's second Assignment of Error is overruled.

### III. EXPERT WITNESS

{¶69} In his third Assignment of Error, Firman Mast argues the trial court abused its discretion when it overruled his motion in limine and objection at trial to exclude the testimony of Bunta's expert witness, Michael Oesch. We disagree.

{¶70} Oesch, an accountant with Veritas Solutions, had a masters degree in accounting and was a certified public account, certified fraud examiner, and private investigator. At trial he testified that he was in the process of applying to be a certified valuation analyst. In preparation for trial, he wrote an expert report (Exhibit KK) and damages summary (Exhibit KK-1) based on the financial documents released in discovery. Firman Mast objected to Oesch's entire report being admitted into evidence. The trial court sustained the objection in part and allowed only the damages summary to be submitted to the jury.

### Standards of Review

{¶71} "A motion in limine is a motion directed to the inherent discretion of the trial court judge to prevent the injection of prejudicial, irrelevant, inadmissible matters into trial." *State v. Strait*, 5th Dist. Delaware No. 14 CAA 12 0081, 2015-Ohio-4264, 2015 WL 5968655, ¶ 24 quoting *Mason v. Swartz*, 76 Ohio App.3d 43, 55, 600 N.E.2d 1121 (6th Dist.1991). "Generally, the grant or denial of such a motion is not a ruling on the evidence." *Mason, supra* at 55. It is a preliminary interlocutory order and the party's

objection must be raised again at trial in order to permit the court to consider the admissibility of the evidence in its actual context. *Id.*

{¶72} The granting or denying a motion in limine are reviewed under an abuse of discretion standard of review. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013–Ohio–1507. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Huth v. Kus*, 5th Dist. No. 2017 AP 06 0015, 2018-Ohio-1931, 113 N.E.3d 140, 2018 WL 2230727, ¶ 30 quoting Rigby v. Lake Cty., 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

{¶73} Firman Mast contended at the hearing on the motion in limine and during trial that the expert report was inadmissible because Oesch was not qualified to conduct a valuation of VacuPress or Superior Lumber. He further contended that the expert report contained impermissible legal conclusions and extraneous information that would confuse the jury. The trial court overruled the motion in limine. He renewed his objections to Oesch's testimony at trial as to the other companies.

**Businesses Not Named as Parties**

{¶74} Within his expert report, Oesch referred to the multiple businesses owned and operated by Bunta and Firman Mast including Ohio Vacupress Association, dba, Vacutherm Midwest, LLC; FM, LLC; Dim X-Port, LLC; Amish Exteriors, Deutsche Roofing Systems, Deutsche Roofing ComAg. The entities were not parties to the litigation.

{¶75} We find no abuse of discretion for the trial court to overrule any objections to Oesch's mention of these entities because their identification was part of the narrative of the relationship between Bunta, Firman Mast, VacuPress, and Superior Lumber. Prior to Oesch's testimony, Bunta and Firman Mast testified and clearly identified the companies and their ownership interests. For example, Dim X-Port, LLC, was not a party to the action but was a limited liability corporation owned and operated by Bunta for the purpose of lumber exporting. Bunta testified he invoiced VacuPress for his services through Dim X-Port for tax purposes. As for Ohio Vacupress, Bunta and Firman Mast created the corporation to accept commissions for the sale of vacuum kilns, which came about because of Bunta's prior relationship with Jim Parker. Bunta used his interest in Ohio VacuPress to fund his portion of the capital call from VacuPress. When analyzing the financial records from VacuPress, the mention of these companies was necessary to explain the flow of funds. The incorporation of the corporations during Oesch's testimony was not an abuse of discretion.

**Valuation**

{¶76} Firman Mast next argues the trial court abused its discretion when it permitted Oesch's testimony because he performed a valuation of Superior Lumber when Oesch was not qualified to complete a valuation. Oesch was not a certified valuation analyst and Firman alleges that Oesch failed to follow the accounting industry standards for performing a valuation.

{¶77} Oesch testified on direct examination there are different methods of conducting a valuation of a business, such as asset-based, income-based, or market-based. He stated he did not and could not conduct a valuation of VacuPress or Superior

Lumber because he did not have the financial data to conduct a valuation. He instead conducted an EBITA analysis on VacuPress and Superior Lumber, which he testified was a way to look at a company's value by adding back interest, taxes, depreciation, and amortization. It gave an economic picture of cash flow and the company's economic value. He testified that an EBITA analysis was not a valuation but a reasonableness calculation.

{¶78} During cross examination, Oesch testified he was a member of the American Institute of Certified Public Accountants and he was aware of the AICPA standards for conducting valuations but he had never read the standards. He stated that he did not perform a valuation in this engagement. He performed an evaluation, which was an estimate of value calculated with a reasonable degree of accounting certainty.

{¶79} John Cook, Firman Mast's expert, testified he conducted a valuation of VacuPress and Superior Lumber using the net asset value method. On December 2, 2016, he testified Bunta's 30% interest in VacuPress was valued at $2,000. On October 3, 2019, Bunta's alleged 30% interest in Superior Lumber would be valued at $11,000.

{¶80} We find through direct and cross examination, Oesch's methods for determining Bunta's damages were clarified for the jury's scrutiny. Firman Mast's expert conducted a valuation of VacuPress and Superior Lumber, resulting in an opinion of damages much less than Oesch's. In this case, we find the trial court did not abuse its discretion in finding Firman Mast's arguments went to the weight of the evidence, not admissibility.

{¶81} The third Assignment of Error is overruled.

**CONCLUSION**

{¶82} The judgment of the Holmes County Court of Common Pleas is affirmed.

By: Delaney, J.,

Gwin, P.J. and

Hoffman, J., concur.