[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Bunta v. Superior VacuPress, L.L.C.*, Slip Opinion No. 2022-Ohio-4363.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4363

BUNTA, APPELLEE, *v.* SUPERIOR VACUPRESS, L.L.C.; MAST, APPELLANT;

ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Bunta v. Superior VacuPress, L.L.C.*, Slip Opinion No. 2022-Ohio-4363.]

*Conversion and unjust-enrichment claims brought by member of limited-liability company after its dissolution—Trial court erred in denying motion for directed verdict.*

(No. 2021-0066—Submitted February 8, 2022—Decided December 9, 2022.)

APPEAL from the Court of Appeals for Holmes County, No. 20CA006, 2020-Ohio-5500.

_____

**O'CONNOR, C.J., announcing the judgment of the court.**

{¶ 1} This discretionary appeal involves a civil dispute over a dissolved limited-liability company.  The trial court denied appellant Firman Mast's ("Firman's") motion for a directed verdict on appellee Vasile Bunta's claims of

conversion and unjust enrichment, and a jury returned a verdict against Firman on those claims. The Fifth District Court of Appeals affirmed. Because we determine that the trial court erred in denying Firman's motion for a directed verdict on the conversion and unjust-enrichment claims, we reverse the judgment of the court of appeals and enter judgment on those claims in favor of Firman.

**Relevant Background**

*Creation and Operation of Superior VacuPress, L.L.C.*

{¶ 2} In 2013, during a long car trip, Firman and Bunta began discussing the benefits of drying lumber with vacuum kilns. Bunta was trained as an electrical engineer, and through his experience working in the lumber-exporting business, he had become familiar with the vacuum-drying process, which involves pulling moisture from freshly cut lumber with heat and suction to prevent the lumber from warping and splitting. On that trip, Bunta explained to Firman the benefits of placing cut lumber in a vacuum kiln and the potential profits available from investing in this kind of technology. He explained that vacuum drying involves less drying time and results in less warping or splitting of the lumber than traditional drying methods. At the time, Bunta operated his own lumber-export business, and he informed Firman that he had suppliers and customers in the lumber industry. Firman owned a roofing business at the time and was interested in the vacuum kilns as another business venture.

{¶ 3} After the initial discussions, Firman and Bunta agreed to go into the lumber-drying business together; this business was later named Superior VacuPress ("VacuPress"). From January to April 2014, Bunta worked on the business plan, created the plant layout, and assembled technical data about the kilns. Bunta also introduced Firman to Jim Parker, Bunta's contact at the company from which VacuPress planned to purchase the vacuum kilns. Firman, on the other hand, worked on securing financing and property for building the plant. He discussed the

2

business with his father, Dennis Mast ("Dennis"), and Dennis permitted Bunta and Firman to build VacuPress's facility on his land.

{¶ 4} For financing, Firman and Bunta consulted with Commercial and Savings Bank. Firman testified that the bank's representative told him that Bunta could not be an owner in VacuPress, because of his "bad credit." Consequently, Firman signed the loan documents personally and as manager of VacuPress. Firman used his personal and business assets as collateral for the loan, but because those assets were not adequate backing to secure financing, Dennis cosigned the loans and mortgaged his farm as additional collateral. The bank ultimately provided multiple loans totaling $1,433,000 and issued a line of credit to VacuPress.

{¶ 5} In April 2014, Firman and Dennis signed the operating agreement for VacuPress, which listed both as members and assigned Firman as the manager of the company. In exchange for Dennis's cosigning the loans and permitting VacuPress's facility to be built on his land, Dennis received a 15 percent interest in VacuPress. Firman received the remaining 85 percent interest in the company. Notably, Bunta was not made a member under the 2014 operating agreement. Nevertheless, Bunta helped set up the equipment for the business, and his efforts contributed to the company's first vacuum kiln becoming operational in December 2014.

{¶ 6} Around January 2015, Bunta and Firman discussed receiving no compensation during the beginning of VacuPress's operation but tentatively agreed that if the company was earning enough money in future months, then they could each draw $2,000 a month and could later increase their draw to $4,000 a month. As they worked to get VacuPress off the ground, Bunta's original lumber-export company started to struggle financially and was unable to pay its outstanding balances to various lumber mills.

**{¶ 7}** In December 2015, Firman issued a capital call for reimbursement of the money that he had personally put into the company. There were discussions at that time that Bunta and Mervin Mast ("Mervin"), Firman's brother, were to become members of VacuPress and thus would be included in the capital call according to their respective expected interests in the company. Bunta had an expected interest of 30 percent, and thus was required to pay $33,354. In response to the capital call, Bunta paid $10,000 to VacuPress from his lumber-export company. The parties dispute whether Bunta paid the remainder of his share of the capital call.

**{¶ 8}** In January 2016, a document titled "Amended and Restated Operating Agreement," which made Bunta and Mervin members of the company, was executed by all four members. The result was the following ownership makeup: Firman owned 45.9 percent, Bunta owned 30 percent, Dennis owned 13.5 percent, and Mervin owned 10.6 percent.

**{¶ 9}** Soon after Bunta became a member, Firman started to receive phone calls from his business contacts complaining about Firman's association with Bunta and Bunta's failure to pay outstanding debts from his lumber businesses. More specifically, Firman testified that certain lumber mills and suppliers to whom Bunta owed money said they would not sell lumber to VacuPress. Consequently, Firman called a member meeting in March 2016 to discuss the financial difficulties facing VacuPress. Prior to that meeting, Bunta approached Firman about receiving payment for work he performed in creating VacuPress in 2014 and 2015. Firman told Bunta to provide invoices for that work, and Bunta brought the invoices to the March meeting. Bunta secretly recorded that meeting, and the recording was played at trial. At the meeting, Firman, Dennis, and Mervin confronted Bunta and encouraged him to resolve his debts with the lumber mills. Bunta stated that his outstanding debts were "none of [Mervin's] business" and demanded an exit plan from VacuPress.

4

{¶ 10} Following that March meeting, Bunta stopped working for, and broke off his relationship with, VacuPress. VacuPress continued to struggle financially. Specifically, the company had difficulty making monthly payments on its loans, and no member received any draws. In April 2016, Firman sent Bunta a letter that demanded the remainder of Bunta's share of the capital call and listed VacuPress's liabilities and assets to demonstrate that the liabilities exceeded the value of the assets. Subsequently, Firman offered Bunta a $20,000 buyout, which Bunta did not accept.

*Dissolution of VacuPress and Creation of Superior Lumber, L.L.C.*

{¶ 11} In August 2016, Firman notified the members in writing that VacuPress would be "liquidated and dissolved" and its "affairs * * * wound up." A few months later, in November 2016, Firman created Superior Lumber, L.L.C., also a lumber-drying business, with Firman, Dennis, and Mervin as members. Firman transferred the assets and debts from VacuPress to Superior Lumber. Before Firman could do so, the bank, which was VacuPress's primary creditor, required him to sign an assumption agreement. Under that agreement, Superior Lumber was made fully responsible for the repayment of the loans owed by VacuPress, Firman, and Dennis. In January 2017, the Ohio Secretary of State received notification that VacuPress had been dissolved. On January 1, 2017, Superior Lumber began operations.

*Trial and Appeal to the Court of Appeals*

{¶ 12} In June 2017, Bunta filed suit against VacuPress, Superior Lumber, Firman, Mervin, and Dennis, asserting claims for breach of fiduciary duty, conversion, civil conspiracy, and unjust enrichment. Bunta also brought claims for declaratory judgment, judicial dissolution, and an accounting, but he later voluntarily dismissed these claims. Bunta later dismissed VacuPress as a defendant, and the court granted a directed verdict in favor of Mervin. We limit the recitation of the procedural history for purposes of this appeal, but the full

description can be found in the court of appeals' decision, *see* 2020-Ohio-5500, 163 N.E.3d 1153, ¶ 20-27.

{¶ 13} The matter proceeded to a three-day jury trial. The heart of Bunta's theory at trial was that he was not compensated when Firman dissolved VacuPress. Bunta argued that the Masts had never had any intention of liquidating VacuPress and that, under the guise of having no money, they had "cheat[ed]" Bunta out of his 30 percent membership interest in VacuPress by forming Superior Lumber and transferring all of VacuPress's assets and debts to the new company. Bunta offered expert testimony from Michael Oesch, who testified that based on the value of Superior Lumber as stated in Firman's 2017 personal financial statement, a 30 percent interest in the company was valued at $500,000.

{¶ 14} Firman maintained that transferring VacuPress's assets and liabilities to Superior Lumber was his only option as manager of VacuPress. He testified that he was unable to find a buyer for VacuPress's assets and explained that the vacuum kilns are used by only a few companies in the world, which limited the pool of potential buyers. Firman further stated that, as he had explained in his April 2016 letter to Bunta, selling the company's assets would not have covered the liabilities owed to creditors; VacuPress would still have owed half a million dollars to creditors if it had been liquidated. Because Firman and his father had personally signed for the bank loans and because Firman did not believe that Bunta would pay his share of the debt if VacuPress liquidated, based on Bunta's alleged failure to pay the remainder of the capital call, Firman believed that his "only option at that time was to form Superior Lumber and take on the liabilities." The bank's representative, Steven Kilpatrick, also testified that there was no equity in the equipment based on its depreciation and the fact that "nobody else in [the] area was using that type of equipment at the time" and, therefore, selling the equipment would likely have resulted in a substantial loss.

**{¶ 15}** During the trial, Firman moved for a directed verdict on Bunta's conversion and unjust-enrichment claims; the trial court denied the motion.[1] Relevant here, the jury returned verdicts against Firman on the conversion and unjust-enrichment claims, awarding damages to Bunta for both claims.[2] The jury returned a verdict in favor of Firman on Bunta's breach-of-fiduciary-duty claim. The trial court journalized the jury's verdict.

**{¶ 16}** Firman appealed to the Fifth District. Regarding Bunta's conversion claim, he argued that the claim was barred as a matter of law because Bunta had failed to identify any personal property allegedly converted by Firman. The Fifth District disagreed. In doing so, it relied on this court's decision in *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St.2d 224, 351 N.E.2d 454 (1976), *rev'd on other grounds*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), which concluded that in addition to tangible chattels, "intangible rights which are customarily merged in or identified with some document may also be converted," *id*. at 226-227. The court of appeals emphasized that there is no "bright line test" for determining whether property can be the subject of a conversion action but that the court must look to see if the intangible property is identifiable. 2020-Ohio-5500, 163 N.E.3d 1153, at ¶ 45. It concluded that Bunta's membership interest in VacuPress was identifiable intangible property because Firman transferred the assets and debts of VacuPress to Superior Lumber and Oesch (Bunta's expert) was able to calculate the value of Bunta's 30 percent membership interest in VacuPress from the value of Superior Lumber. *Id*. at ¶ 48-49.

---

1. While the trial court never explicitly ruled on Firman's proffered motion for a directed verdict, we treat the trial court's failure to rule on the motion as a denial of the motion. *See Minocchi v. Minocchi*, 5th Dist. Stark No. 2003CA00431, 2004-Ohio-4635, ¶ 9 ("When a trial court fails to rule on a motion, the motion is considered denied").

2. The jury returned verdicts in favor of Dennis and Superior Lumber on the unjust-enrichment and conversion claims and in favor of Dennis on the breach-of-fiduciary-duty claim. The jury also returned verdicts in favor of Dennis, Firman, and Superior Lumber on the civil-conspiracy claims.

**{¶ 17}** The court of appeals also rejected Firman's argument that Bunta's unjust-enrichment claim was barred because the relationship between the parties was governed by the terms of the Amended and Restated Operating Agreement. It concluded that "Bunta used his technological knowledge and business expertise to assist Firman Mast in the creation of VacuPress," *id.* at ¶ 64, and therefore, reasonable minds could come to differing conclusions as to whether Bunta conferred benefits on Firman before they entered into the operating agreement, *id.* at ¶ 67. For these reasons, the court of appeals affirmed the trial court's judgment.

**{¶ 18}** We accepted Firman's discretionary appeal, which presents two propositions of law. *See* 162 Ohio St.3d 1427, 2021-Ohio-1202, 166 N.E.3d 26. In Firman's first proposition, he contends that compensation for a membership interest in a dissolved limited-liability company cannot be the subject of conversion. In his second proposition, he asserts that a manager of a limited-liability company who complies with his or her duties under the operating agreement in dissolving the company cannot be liable for conversion of a membership interest or for unjust enrichment.

**Analysis**

**{¶ 19}** A motion for a directed verdict should be granted when after construing the evidence most strongly in favor of the nonmoving party, the court finds that reasonable minds could come to but one conclusion and that conclusion is in favor of the moving party. Civ.R. 50(A)(4). A trial court's decision on a motion for a directed verdict is a question of law that we review de novo. *See Rieger v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 2019-Ohio-3745, 138 N.E.3d 1121, ¶ 8. Although a motion for a directed verdict does not present a question of fact, "it is necessary to review and consider the evidence" when deciding such a motion. *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982), paragraph one of the syllabus, citing *O'Day v. Webb*, 29 Ohio St.2d 215, 280 N.E.2d 896 (1972), paragraph three of the syllabus.

*The Conversion Claim*

**{¶ 20}** Conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner or the withholding of the property from the owner's possession under a claim inconsistent with the owner's rights. *See Zacchini*, 47 Ohio St.2d at 226, 351 N.E.2d 454. In *Zacchini*, this court concluded that although the original rule at common law permitted only *tangible* chattels to be subject to conversion, "it is now generally held that intangible rights which are customarily merged in or identified with some document may also be converted." *Id*. at 226-227. Examples include bank passbooks, deeds, and drafts. *Id*. at 227.

**{¶ 21}** In *Zacchini*, we concluded that the plaintiff's image as a "human cannonball," which a news program broadcasted in a 15-second film clip, was not an intangible asset subject to conversion, largely because it was too difficult to identify what right had been "taken," *id*. "[Was] it the right to perform the act, to view it, to present it on television, to license its filming, or some other right?" *Id*. We explained, "The distinguishing characteristic of conversion is the forced judicial sale of the chattel or right of which the owner has been wrongfully deprived." *Id*. Accordingly, we held that the plaintiff's conversion claim failed, and we cautioned that while "[j]udicial ingenuity could perhaps award damages and find a *res* said to be sold," extending the scope of conversion to the rights claimed by the plaintiff, which "are more appropriately considered under wholly distinct legal principles," would be "confusing, unnecessary, and improper." *Id*.

**{¶ 22}** Here, Firman contends that Bunta's conversion claim must fail because Bunta's membership interest in VacuPress is not the type of intangible property that is subject to conversion. More specifically, Firman asserts that Bunta possesses no property right subject to conversion, because VacuPress's debts exceeded the value of its assets at the time of dissolution and, therefore, Bunta's membership interest, which included the right to share in the profits, had no value. Firman contends that holding otherwise would go directly against this court's

warning in *Zacchini* about extending conversion claims to rights that are better considered under "wholly distinct legal principles," *id.*, 47 Ohio St.2d at 227, 351 N.E.2d 454.

{¶ 23} Bunta first takes issue with Firman's use of the term "dissolution," arguing that Firman did not liquidate and dissolve VacuPress in the traditional way. Rather, Bunta asserts, Firman "rolled over" VacuPress's assets and liabilities into Superior Lumber, thereby converting Bunta's 30 percent membership interest, which includes the right to compensation for his membership interest upon dissolution. Bunta further argues that "[a] member's right to compensation for its membership interest at dissolution is exactly the type of intangible property" contemplated in *Zacchini* and is subject to conversion because it is easily identifiable.

{¶ 24} As a preliminary matter, we note that at the heart of Bunta's argument is a frustration with how Firman handled the winding down and dissolution of VacuPress and the creation of Superior Lumber. But that issue is not before us. The jury returned a verdict in favor of Firman on Bunta's claim for breach of fiduciary duty, finding that Firman had held the authority to wind up and dissolve VacuPress and had not breached any duty in doing so. Bunta did not appeal from the trial court's judgment. Therefore, we assume for the purposes of this appeal that the dissolution of VacuPress was proper.

{¶ 25} The threshold inquiry for a conversion claim is whether there exists some property interest or right. The parties present diverging characterizations of the property interest at issue here. Firman characterizes Bunta's conversion claim as seeking damages for compensation for Bunta's membership interest in a dissolved limited-liability company. And he asserts that a claimed right to compensation is "not the type of intangible asset that is subject to conversion." Bunta, on the other hand, believes that his property interest subject to conversion was not a purely economic interest but, rather, a conversion of his personal property

10

in the form of his membership interest in VacuPress. Stated differently, Bunta believes that his membership interest in VacuPress was converted to Superior Lumber: "Bunta's 30 [percent] membership interest in Superior VacuPress was converted by [Firman] when he rolled Superior VacuPress assets and debts into Superior Lumber." He further emphasizes that "[a] member's right to compensation for a membership interest at dissolution" is intangible property.

{¶ 26} To determine how to characterize the nature of the property interest at issue, we look to the operating agreement and any relevant statutes in effect when the operating agreement was executed—here, January 2016. In January 2016, "membership interest" in a limited-liability company was defined by statute as "a member's share of the profits and losses of [the] limited liability company and the right to receive distributions from that company." Former R.C. 1705.01(H), 2012 Sub.H.B. No. 48.[3] The Amended and Restated Operating Agreement for VacuPress adopted this statutory definition of a membership interest. Also in January 2016, former R.C. 1705.17, Sub.S.B. No. 74, 145 Ohio Laws, Part I, 634, 699,[4] stated, "A membership interest in a limited liability company is personal property."

{¶ 27} The Amended and Restated Operating Agreement for VacuPress provided that "the Company shall continue in existence until terminated as provided in Section 15.1 of this Agreement." Section 15.1 set forth three possible termination events that would trigger the company's liquidation and dissolution. Upon a termination event—here it was the decision of the manager, Firman, to dissolve VacuPress—the winding-up process was triggered. The company manager was to oversee the process, and like the version of Ohio's Limited Liability Company Act in effect in January 2016, Section 15.3 of the Amended and

---

3. R.C. 1705.01 was repealed effective January 1, 2022, 2020 Am.Sub.S.B. No. 276, Sections 3 and 4, but was in effect when the Amended and Restated Operating Agreement was executed.

4. R.C. 1705.17 was repealed effective January 1, 2022, 2020 Am.Sub.S.B. No. 276, Sections 3 and 4, but was in effect when the Amended and Restated Operating Agreement was executed.

Restated Operating Agreement required the dissolving company to first distribute its assets to satisfy the company's obligations to its creditors. *See* former R.C. 1705.46(A)(1), (B), Sub.S.B. No. 74, 145 Ohio Laws, Part I, at 734.[5] Only after the company had satisfied its creditors could it distribute "the balance, if any, to the [members] in accordance with their Capital Account balances." *See also* former R.C. 1705.46(A)(3). The Amended and Restated Operating Agreement provided that the company would continue in existence "until its assets [had] been distributed in accordance with Section 15.3" and stated that the company "shall terminate" when a certificate of dissolution is filed with the secretary of state.

{¶ 28} Based on the above, two things are clear. First, Bunta's right to compensation for his membership interest at dissolution was available *only if* the value of VacuPress's liquidated assets exceeded the value of its obligations. And the evidence presented at trial demonstrated that this was not the case. At trial, Firman testified that he was unable to find someone to buy VacuPress's assets, that the vacuum kilns were "specialized equipment," which limits the number of potential buyers, and that selling the company's assets would not have resulted in enough funds to cover the debts owed to its creditors. Firman explained that in 2016, he "did research and put a market value to all the assets" and that after comparing that amount with the roughly one million dollars the company owed to creditors, he determined that even if VacuPress liquidated, it would still owe half a million dollars in obligations. The letter Firman sent to Bunta in April 2016 also indicated that the value of the company's obligations was more than the value of its assets.

{¶ 29} Kilpatrick, the bank's representative, corroborated Firman's statements. He testified that there was no equity in the equipment because "the original cost of the equipment was actually less than what [the bank was] owed on

---

5. R.C. 1705.46 was repealed effective January 1, 2022, 2020 Am.Sub.S.B. No. 276, Sections 3 and 4, but was in effect when the Amended and Restated Operating Agreement was executed.

those equipment loans" and "nobody else in [the] area was using that type of equipment at the time." Additionally, there was testimony that VacuPress did not own the property its facility was built on and, thus, if the company liquidated, it would receive no compensation for its facility.

{¶ 30} Bunta did not present evidence that there was a market for VacuPress's equipment or other assets, that there were interested buyers, or that the value of the company's assets exceeded its debts at the time of dissolution. In fact, Bunta dismissed his accounting claim, which would have established whether he had a right to compensation for his membership interest in VacuPress at the time of dissolution. Moreover, Bunta's expert, Oesch, focused his testimony on the value of Superior Lumber, the company that assumed VacuPress's assets and liabilities, rather than on the value of VacuPress's assets compared to its debts at the time of dissolution. Indeed, Oesch admitted that he never did a valuation of VacuPress as of the time of its dissolution. In short, Bunta presented no evidence at trial that he had any right to compensation for his membership interest in VacuPress at the time it was dissolved.

{¶ 31} Second, it is clear from the language of the Amended and Restated Operating Agreement that VacuPress's existence continued until its assets were distributed in accordance with the terms of the agreement and its existence terminated when the certificate of dissolution was filed with the secretary of state. There is no dispute properly before us over whether those events occurred. And nothing in the Amended and Restated Operating Agreement or the relevant statutes indicates that anyone's membership interest in VacuPress continued beyond the company's termination. Bunta cites no authority supporting such a finding. Moreover, as Bunta concedes, he is not a member of Superior Lumber. Bunta's disagreement with *how* VacuPress was dissolved does not identify a res, intangible or otherwise, that could be the subject of a conversion claim.

**{¶ 32}** The court of appeals relied on the Second District Court of Appeals' decision in *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 741 N.E.2d 155 (2d Dist.2000), which held that a minority partner's partnership interest was intangible property subject to conversion and upheld a jury's determination that the interest had been wrongly converted. In *Schafer*, the majority partners had issued a capital call, activating a provision within the partnership agreement that diluted the interest of any partner who did not meet the capital call. *Id.* at 255. Because the minority partner could not raise the amount of money required for the capital call, his 25 percent partnership interest was reduced to 6 percent. *Id.* A jury found that the majority partners had converted the minority partner's partnership interest, and the Second District affirmed. *Id.* at 255, 286. In doing so, the Second District reasoned that "the correct approach is to analyze the particular type of intangible asset, to see if allowing a conversion claim makes sense." *Id.* at 285. And it concluded that the conversion claim made sense because the minority partner's partnership interest was identified in the partnership agreement and because the evidence at trial established that the minority partner had had a 25 percent interest in the only partnership asset, a five-acre commercial property. *Id.* at 286-287.

**{¶ 33}** We find *Schafer* distinguishable from the present case in several ways. First, *Schafer* involved a partnership interest, which included " 'rights in specific partnership property,' " *id.* at 285, quoting former R.C. 1775.23, and the property interest converted was the minority partner's 19 percent interest in the partnership's *only* asset, the five-acre commercial property. *Schafer* at 287. The intangible-property interest converted was therefore easily identifiable; the majority partners converted the minority partner's 19 percent interest in that commercial property. *Id.* Moreover, in *Schafer*, the minority partner's interest in the partnership had not been reduced because the partnership was terminated or dissolved but because the majority partners had made a wrongful capital call. *Id.* at 286-287. Last, in addition to the conversion claim, the jury in *Schafer* found the

majority partners had breached their fiduciary duties owed to the minority partner for the wrongful capital call and their failure to disclose information. *Id*. at 280.

{¶ 34} Contrary to the suggestion in the opinion concurring in judgment only, we do not "conflate[] damages with the availability of a conversion claim," opinion concurring in judgment only, ¶ 48. As noted above, the threshold inquiry for a conversion claim is whether there indeed exists some property right. To determine whether an intangible-property right may be subject to conversion, the right needs to be identifiable; the court must be able to identify what has been taken. *Zacchini*, 47 Ohio St.2d at 227, 351 N.E.2d 454. As a result, we discuss the issue of compensation at the time of dissolution because that is how the parties framed the intangible property right that was taken. We agree with the opinion concurring in judgment only that a membership interest includes the right to share in profits and losses and to receive distributions from the company and is "more than simply the member's share of the company's net assets," opinion concurring in judgment only at ¶ 50-51. Yet the only right included in Bunta's membership interest that Bunta identified as taken was his "right to compensation for [his] membership interest at dissolution." And Bunta failed to establish that he had such a right.

{¶ 35} Because there is no evidence that Bunta's personal property was converted, the trial court erred in denying Firman's motion for a directed verdict. Although we decline to adopt the bright-line rule that a member's claimed right to compensation for his or her membership interest at dissolution can never be intangible property subject to conversion, as Firman proposes, we nevertheless caution courts to be wary of conversion claims so inherently intertwined with contract principles. To rephrase our warning in *Zacchini*, though "[j]udicial ingenuity" could perhaps award damages and find a res said to be sold, not all intangible rights are subject to being converted, and courts must be careful not to extend the scope of conversion to rights that are "more appropriately considered

under wholly distinct legal principles" lest the extension lead to "confusing, unnecessary, and improper" results. *Id.* at 227.

*The Unjust-Enrichment Claim*

**{¶ 36}** A successful claim of unjust enrichment requires a showing that (1) a benefit was conferred by the plaintiff on the defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances in which it was unjust to do so without payment. *See Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984). Unjust enrichment is an equitable claim based on a contract implied in law, *see Hummel v. Hummel*, 133 Ohio St. 520, 525-528, 14 N.E.2d 923 (1938), the purpose of which "is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant," *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954). Generally, Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject matter. *Id.* ("It is generally agreed that there cannot be an express agreement and an implied contract for the same thing existing at the same time"). "The mere fact that issues exist as to the creation of the contract or the construction of its terms does not alter this rule." *Caras v. Green & Green*, 2d Dist. Montgomery No. 14943, 1996 WL 407861, *10 (June 28, 1996).

**{¶ 37}** Firman contends that the Amended and Restated Operating Agreement for VacuPress controlled the relationship between Firman and Bunta and therefore bars Bunta's unjust-enrichment claim. Further, he asserts that Bunta received recognition for his initial assistance with starting VacuPress when he was given a membership interest in the company.

**{¶ 38}** Bunta counters that the operating agreement does not preclude his unjust-enrichment claim, because Bunta provided services to VacuPress before he became a member and because he was never paid for those services. More specifically, at trial, Bunta argued that the benefits he conferred on Firman included

16

providing technical knowledge and business expertise in the lumber-drying business, introducing Firman to his contact Jim Parker at the company where VacuPress purchased the vacuum kilns, and drawing up VacuPress's business plan and the plant layout. He contended that he provided these benefits without payment between 2014 and 2015, before he was a member of VacuPress, and that Firman, in turn, used the benefits to create and operate VacuPress and later to create Superior Lumber.

**{¶ 39}** The doctrine of unjust enrichment is limited when an express contract exists that concerns the same subject because " 'the parties have fixed their contractual relationship in an express contract,' " and thus, " 'there is no reason or necessity for the law to supply an implied contractual relationship between them.' " *Champion Contracting Constr. Co., Inc. v. Valley City Post No. 5563*, 9th Dist. Medina No. 03CA0092-M, 2004-Ohio-3406, ¶ 25, quoting *Gehrke v. Smith*, 12th Dist. No. CA92-10-027, 1993 WL 243816, *2 (July 6, 1993). Bunta and Firman fixed their relationship in an express contract, the Amended and Restated Operating Agreement, and that agreement concerns the same subject as Bunta's unjust-enrichment claim.

**{¶ 40}** The Amended and Restated Operating Agreement identified VacuPress as a limited-liability company formed in April 2014, designated Bunta as a member of VacuPress effective January 2016, and established the procedures and systems to "govern the relationship" between the members of VacuPress and between VacuPress and its members. More specifically, the operating agreement set forth how the members of VacuPress would receive compensation and under what conditions. For example, the operating agreement specified, "[T]he Company will distribute Distributable Cash to the [members] in proportion to their respective Unit ownership at such times as the Manager shall determine in good faith" and "Net Profit or Net Loss for each fiscal year shall be allocated to the [members] in proportion to their respective Unit ownership." We therefore conclude that any

compensation that Bunta expected for the benefits he conferred on Firman in the creation and establishment of VacuPress was clearly within the scope of the Amended and Restated Operating Agreement, and the fact that those services were performed prior to Bunta's becoming a member under that agreement is irrelevant. *See Caras*, 1996 WL 407861, at *10.

{¶ 41} Moreover, " '[a] person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give in return.' " *Ullmann v. May*, 147 Ohio St. 468, 478, 72 N.E.2d 63 (1947), quoting Restatement of the Law, Restitution, Section 107, Comment a (1937). The court of appeals noted that prior to the March 2016 meeting, Bunta informed Firman that he wanted to be paid for the work he performed for VacuPress in 2014 and 2015 and that Bunta brought invoices for such work to that meeting. 2020-Ohio-5500, 163 N.E.3d 1153, at ¶ 63. It concluded that this evidence suggested that Bunta used his expertise to assist Firman in the creation of VacuPress and "expected future compensation as a member of VacuPress but received nothing when he was squeezed out of VacuPress." *Id*. at ¶ 64. Yet the invoices Bunta brought to the March meeting were created on March 21, 2016, over two months *after* Bunta became a member of VacuPress. Further, Bunta admitted at trial that he did not request payment for his work on the initial setup of VacuPress prior to submitting those invoices. Bunta directs this court to no other evidence to support the assertion that he expected anything other than becoming a member of VacuPress and receiving the compensation therefrom for the services he provided in creating and establishing VacuPress.

{¶ 42} Bunta never asserted that he was not of sound mind or under duress when he entered into and signed the Amended and Restated Operating Agreement. *See Ullmann* at 477-478. If Bunta believed that he should have received back pay for the services he provided prior to becoming a member in addition to receiving a

18

30 percent membership interest and the compensation due therefrom, then he could have contracted for it. And if Bunta wanted to ensure future compensation as a member of VacuPress, he could have requested that the Amended and Restated Operating Agreement include provisions securing as much. But he did not, and he cannot now turn to rules of equity for compensation because VacuPress was dissolved sooner than he expected. *See Valentine v. Cedar Fair, L.P.*, __ Ohio St.3d __, 2022-Ohio-3710, __ N.E.3d __, ¶ 18. To permit otherwise would potentially allow Bunta to recover more than he bargained for and would open the floodgates for actions claiming unjust enrichment.

{¶ 43} Because there was an express and valid contract between Firman and Bunta that covered the same subject as Bunta's unjust-enrichment claim, we hold that the trial court erred in denying Firman's motion for a directed verdict.

### Conclusion

{¶ 44} There is insufficient evidence as a matter of law to support Bunta's claims of conversion and unjust enrichment against Firman. We therefore hold that the trial court erred in denying Firman's motion for a directed verdict on those claims and that the court of appeals erred in affirming the trial court's judgment. Accordingly, we reverse the Fifth District Court of Appeals' judgment and enter judgment on those claims in favor of Firman.

Judgment reversed.

DONNELLY and STEWART, JJ., concur.

FISCHER, J., concurs in judgment only, with an opinion joined by KENNEDY and DEWINE, JJ.

BRUNNER, J., dissents.

_____

**FISCHER, J., concurring in judgment only.**

{¶ 45} I agree with the lead opinion's analysis of the unjust-enrichment claim. However, I disagree with its analysis of the conversion claim because I

would adopt the bright-line rule that the lead opinion rejects and would hold that a membership interest governed by an operating agreement can never be subject to a conversion claim. Accordingly, I concur in judgment only.

{¶ 46} A membership interest memorialized by an operating agreement cannot be subject to a conversion claim, because operating agreements lay out the circumstances under which a manager may wind up and dissolve a company and how the manager is to do so. Because the operating agreement defines the parties' obligations and membership rights, a member must bring any "conversion" claim as a breach of the terms of the operating agreement.

{¶ 47} In this case, appellee, Vasile Bunta, did properly bring a claim under the terms of the operating agreement against appellant, Firman Mast, for breach of fiduciary duty, but the jury found in Firman's favor on that claim. Logically, because the jury found that Firman acted in good faith and did not breach his fiduciary duty when he dissolved Superior VacuPress, L.L.C., ("VacuPress"), Firman cannot be liable for conversion of Bunta's membership interest. However, if the jury had found that Firman had breached his fiduciary duty in dissolving the company, it still could not have awarded Bunta damages for conversion, because that would constitute a double recovery. Therefore, I would hold that the existence of the operating agreement bars Bunta's claim for conversion.

{¶ 48} The lead opinion declines to adopt the bright-line rule that "a member's claimed right to compensation for his or her membership interest at dissolution can never be intangible property subject to conversion" but determines that in *this* case, Bunta's conversion claim *is* barred. Lead opinion, ¶ 35. The lead opinion reasons that Bunta's conversion claim is barred because VacuPress's liabilities exceeded the value of its assets at the time of its dissolution and therefore Bunta was not entitled to any compensation. But that approach conflates damages with the availability of a conversion claim and misconstrues Bunta's claim.

**{¶ 49}** By concluding that Bunta has no conversion claim because VacuPress's liabilities exceeded the value of its assets, the lead opinion is actually taking issue with the amount of damages that were assessed by the jury, but that issue is not before this court. Firman's propositions of law are as follows:

> 1. Compensation for a membership interest in a dissolved limited liability company cannot be the subject of conversion.
>
> 2. Limited liability company managers who comply with their duties under the operating agreement in dissolving the company cannot be liable for conversion of a membership interest or unjust enrichment.

In other words, the issue before this court is whether conversion claims are ever available in cases such as this one, when an operating agreement exists. By declining to adopt the bright-line rule, the lead opinion would answer the issue before this court by holding that conversion claims for membership interests are available even when a company is governed by an operating agreement. The lead opinion then improperly dives into the issue of damages, which was an issue that was determined by the jury and is not contained in either proposition of law that we accepted for review.

**{¶ 50}** Furthermore, the lead opinion states that it analyzes VacuPress's net assets because the only right Bunta identifies as having been taken was his right to compensation at dissolution. Lead opinion at ¶ 34. But that is not true. Bunta alleges that Firman converted his ongoing membership interest in VacuPress, not his share of compensation upon dissolution. Former R.C. 1705.01(H) defines "membership interest" as "a member's share of the profits and losses of a limited liability company and the right to receive distributions from that company." 2012

Sub.H.B. No. 48. The right to share in profits and losses and to receive distributions from the company is a *future* interest that goes far beyond the value of the company's current net assets. This principle is obvious when one considers the fact that Firman and the other members of VacuPress decided to essentially retain their membership interests in VacuPress by becoming members of the new company, Superior Lumber, L.L.C.

{¶ 51} A membership interest in a limited-liability company is worth more than simply the member's share of the company's net assets. However, when an operating agreement exists that sets forth when and how the manager may wind up the company, a membership interest memorialized by that operating agreement cannot be subject to a conversion claim. Rather, the member must bring his or her claim under the terms of the operating agreement. Bunta did so here. The jury simply found that Firman did not breach his fiduciary duty in dissolving VacuPress.

{¶ 52} Because the operating agreement set forth when and how VacuPress could be dissolved, the trial court erred when it denied Firman's motion for a directed verdict on the conversion and unjust-enrichment claims, and the decision of the Fifth District should be reversed. Because the lead opinion declines to adopt a bright-line rule and instead analyzes issues that are not before this court, I concur in judgment only.

KENNEDY and DEWINE, JJ., concur in the foregoing opinion.

––––––––––––––––

Eques, Inc., Thomas D. White, and Matthew A. Kearney, for appellee.

Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Owen J. Rarric, and Matthew P. Mullen, for appellant.

––––––––––––––––