[Cite as *Miller v. Bates*, 2025-Ohio-1679.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| SANDRA MILLER | : | |
| | : | |
| Appellant | : | C.A. No. 2024-CA-9 |
| | : | |
| v. | : | Trial Court Case No. 22CV00328 |
| | : | |
| BRIAN KEITH BATES | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 9, 2025

. . . . . . . . . . .

WILLIAM M. HARRELSON, II, Attorney for Appellant

BENJAMIN D. EBERLY, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Sandra Miller appeals from a judgment entry in favor of Brian Keith Bates, following a bench trial, on his counterclaim for unjust enrichment. For the reasons that follow, the judgment of the trial court will be reversed, and the matter will be remanded for further proceedings consistent with this opinion.

**Facts and Procedural History**

{¶ 2} Miller and Bates were once romantically involved, and in late March or early April 2019, construction began on a barn-style residence on property that Miller had purchased from Bates's mother a month earlier. Bates served as the general contractor on the construction. Miller and Bates resided in the residence during and after the construction until their relationship ended in June 2022.

{¶ 3} This legal action was initially commenced in Darke County Municipal Court on a complaint for forcible entry and detainer filed by Miller against Bates. Bates filed a counterclaim for an equitable division of property, unjust enrichment, and a resulting trust. On Bates's motion, the matter was transferred to the court of common pleas because the amount at issue in his counterclaim exceeded the municipal court's jurisdiction.

{¶ 4} Miller answered Bates's counterclaim. She later filed a motion for summary judgment as to Bates's claim for unjust enrichment, noting that Bates had previously testified that he did not confer a benefit to Miller and, alternatively, because he had voluntarily contributed his efforts to construct the home without any expectation of payment. Miller also dismissed the first and second claims for relief set forth in her complaint for forcible entry and detainer.

{¶ 5} On February 8, 2024, the trial court denied in part and granted in part Miller's motion for summary judgment. The court denied the motion as to the counterclaim for unjust enrichment, and it granted the motion as to the counterclaim for a resulting trust.

{¶ 6} The matter proceeded to a bench trial in May 2024, as the only remaining claims were equitable in nature. At the conclusion of Bates's case, counsel for Miller moved to dismiss pursuant to Civ. R. 41 (B); the court denied the motion, finding that

sufficient evidence of unjust enrichment had been presented. After post-trial briefs were filed, the court issued a judgment entry awarding Bates $64,216.53. This judgment is the subject of this appeal.

**Assignments of Error and Analysis**

A. Denial of Motion for Summary Judgment

**{¶ 7}** Miller asserts nine assignments of error. We will first address her ninth assignment, which argues that the trial court erred in denying her motion for summary judgment.

**{¶ 8}** In overruling Miller's motion for summary judgment, the court noted that a "thorough recital of the facts is not necessary, since it is clear there are numerous disputed facts such that genuine issues of material fact exist." The court acknowledged the ongoing dispute as to whether Bates had conferred a benefit to Miller and, if so, whether Miller retained the benefit under circumstances whereby doing so would be unjust without consideration to Bates.

**{¶ 9}** " 'Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made.' " *Mancz v. McHenry,* 2021-Ohio-82, ¶ 90 (2d Dist.), quoting *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, syllabus (1994). Such is the case here. In other words, because genuine issues of material fact existed on the issue of unjust enrichment that were not capable of determination on a motion for summary judgment, the trial court did not err in denying summary judgment.

Miller's ninth assignment of error is overruled.

## B. Denial of Civ.R. 41(B) Motion

{¶ 10} We will next consider Miller's seventh and eighth assignments of error. She asserts that the trial court committed reversible error in denying her Civ.R. 41(B)(2) motion to dismiss and: 1) in finding that expenses allegedly paid by Bates Construction LLC, a non-party, were recoverable in an action brought by Bates; and 2) in finding that Bates established unjust enrichment.

{¶ 11} After hearing argument on the motion, the court concluded that "this is the classic example of an unjust enrichment case," noting that there was testimony "time and time again" that the parties did not have an agreement. According to the court, if there had been a written agreement, "then we would be here on a breach of contract either implied or expressed, a quasi contract or quantum meruit claim. None of those are presented because there was no terms of an agreement."

{¶ 12} The court found that Bates had "certain expectations" which "may not have been remuneration in terms of compensation." The court found that "the expectations went further and throughout [Bates's] own testimony suggested that he had a much more long-term perspective on what the expectations were." The court determined that the concept of unjust enrichment applied in this case.

{¶ 13} Civ.R. 41(B)(2) states:

After the plaintiff, in an action tried by the court without a jury, has completed

the presentation of the plaintiff's evidence, the defendant, without waiving

the right to offer evidence in the event the motion is not granted, may move

for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.   If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Civ. R. 52 if requested to do so by any party.

{¶ 14} "A trial court's ruling on a Civ.R. 41(B)(2) motion will be set aside on appeal 'only if erroneous as a matter of law or against the manifest weight of the evidence.' " *Tillman v. Watson*, 2007-Ohio-2429, ¶ 14 (2d Dist.), quoting *Bank One, Dayton, N.A. v. Doughman*, 59 Ohio App.3d 60 (2d Dist. 1988).   Because the trial court chose to hear additional evidence, which was expressly allowed by Civ.R. 41(B)(2), the trial court's initial decision was not erroneous.   Miller's seventh and eighth assignments of error are overruled.

## C.   Unjust Enrichment

{¶ 15} We will next consider Miller's first three assignments of error.   Miller argues that the trial court committed reversible error, as a matter of law, in granting judgment to Bates on his claim for unjust enrichment because Bates was a volunteer who actually received a benefit while living at her home at no cost to him, and he did not inform Miller of any benefits he allegedly conferred upon her.

{¶ 16} "The 'standard of review following a civil bench trial is whether the trial court's judgment [was] against the manifest weight of the evidence.' "   *Somerfield v. Budz*, 2019-Ohio-4804, ¶ 9 (2d Dist.), quoting *Downtime Rebuild, L.L.C. v. Trinity*

*Logistics, Inc.,* 2019-Ohio-1869, ¶ 12 (1st Dist.). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis in original.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). "Typically, 'an appellate court should not disturb a trial court's findings of fact if the record contains competent, credible evidence to support those findings.' " *Parker v. Newmark Homes Inc.,* 2013-Ohio-4402*,* ¶ 20 (2d Dist.), quoting *Johnson v. Albers*, 2012-Ohio-1367, ¶ 17 (1st Dist.).

{¶ 17} As this Court has explained:

Quantum meruit or unjust enrichment is "an equitable remedy 'giving rise to obligations imposed by law, irrespective of the intentions of the parties, in order to prevent an injustice when one party retains a benefit from another's labors.' " *In re Sucholdoski*, 2011-Ohio-6333, ¶ 8 (9th Dist.), citing *In re Estate of Kirkland*, 175 Ohio App.3d 73, 2008-Ohio-421, 885 N.E.2d 271, ¶ 23 (2d Dist.). "Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another . . . .' " *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20, quoting *Hummel v. Hummel*, 133 Ohio St. 520, 528, 14 N.E.2d 923 (1938). "The elements of unjust enrichment include: 1) a benefit conferred by a plaintiff upon a defendant; 2) knowledge by the defendant of the benefit; and 3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."

(Citations omitted.) *Harco Industries, Inc. v. Elco Textron, Inc.*, 2003-Ohio-2397, ¶ 14 (2d Dist.). "Unjust enrichment is an equitable claim based on a contract implied in law, . . . the purpose of which 'is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant.' " (Citations omitted.) *Bunta v. Superior VacuPress, L.L.C.*, 171 Ohio St.3d 464, 2022-Ohio-4363, 218 N.E.3d 838, ¶ 36.

*Meyer v. Lucas*, 2024-Ohio-3035, ¶ 25 (2d Dist.).

{¶ 18} " 'The benefit conferred by the plaintiff must be in response to a fraud, misrepresentation, or bad faith on behalf of the defendant.' " *Catlett v. Central Allied Ents., Inc.,* 2009-Ohio-4641, ¶ 9, quoting *McCamon-Hunt Ins. Agency*, *Inc. v. Med. Mut. of Ohio*, 2008-Ohio-5142, ¶ 27 (7th Dist.). "This requirement ensures a causal link between the plaintiff's loss and the defendant's benefit." *Id. See, also*, *Schlaegel v. Howell*, 2015-Ohio-4296, ¶ 30 (2d Dist.) (" 'The plaintiff must confer the benefit as a response to fraud, misrepresentation, or bad faith on behalf of the defendant.' "). "In the absence of fraud or bad faith, a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which was agreed between them the other should receive." *Ullmann v. May*, 147 Ohio St. 468, paragraph four of the syllabus (1947).

{¶ 19} "One of the main features of quasi-contract is that it does not entail a meeting of the minds as does an express or an implied in fact contract." *Id.* at ¶ 10, citing *Legros v. Tarr*, 44 Ohio St.3d 1, 7 (1989). "Equity, not intent, governs the application of

the legal fiction."  *Id.,* citing *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.2d 44, 46 (1984).  "However, 'enrichment is not considered to be unjust if the party volunteered his or her services and did not expect payment.' "  *Id.* at ¶ 11, quoting *Pawlus v. Bartrug*, 109 Ohio App.3d 796, 800 (9th Dist.), citing *Paugh & Farmer* at 46.

{¶ 20} In ruling in favor of Bates, the court found that it was undisputed that Bates served as the general contractor on the construction project, engaging subcontractors, ordering materials, performing most of the labor, and making multiple payments for labor and materials in cash, by check, and in-trade.  The court noted Bates's testimony that his personal safe, which was custom-built into the home, was valued at $2,100 and retained by Miller.

{¶ 21} The court found that, although many checks paid to vendors were paid by Bates Construction LLC, Bates testified that he was the sole member of that entity.   The court determined that equitable principles supported a conclusion that whether the checks were issued by Bates personally or by Bates Construction LLC was "immaterial [as] each scenario is basically a payment by Brian Bates."

{¶ 22} The court found by a preponderance of the evidence that: Bates had conferred benefits to Miller through the construction of the home by means of his general contractor services and payment for third-party labor and materials; Miller had knowledge of these benefits; and Miller had retained the benefits under circumstances where it would be unjust to do so without consideration to Bates.   The court concluded that, while Bates may not have expected payment from Miller, he did expect consideration, namely to live at the property for the rest of his life, which was the implicit, if not explicit, plan of the

parties. The court found that any suggestion that Bates had intended to confer an unconditional gift to Miller without consideration was "contrary to the evidence and common sense." The court determined that it was equally unreasonable of Miller to conclude that "she could 'use' Bates to construct a new 5-bedroom custom home for the two of them, and then evict him from the property when the construction was nearly complete." The court specifically found that the following benefits had been conferred by Bates and retained by Miller:

1. $19,872.21 in third-party labor and materials;

2. $2,100 in the value of Bates's personal safe;

3. $7,000 for concrete from Tom Harrington;

4. $2,500 relating to work by Bob Drees;

5. $4,744.32 relating to dirt/gravel from Jason Mills; and

6. $28,000 for general contracting services by Bates.

{¶ 23} The court found that it was unclear whether a pond dug by Matt Reed for $6,500 was done before or after Miller owned the property, and the court declined to include the pond in the unjust enrichment claim. The court also declined to include the costs of individual loads of material hauled by Mills, the in-kind transfer of a pickup truck from Bates to Jack Miller in exchange for labor, the bartered time from Jim Dunlevy, and the estimated payments for fill dirt to Robert Hartzell due to the "speculative nature of the evidence." The court found that an hourly approach for Bates's general contracting services "would be inappropriate since Bates can merely 'estimate' the number of hours

worked at the property."

**{¶ 24}** The record supports the trial court's finding that Bates conferred some benefit to Miller by serving as a general contractor for the project, supplying some labor, and perhaps paying for certain items. The record also supports a finding that Miller retained these benefits. However, with the exception of Bates's gun safe, the record does not support the trial court's conclusion that Miller was unjustly enriched, because Bates acted as a volunteer and also did not pay rent or share living expenses in the home for 30 months.

**{¶ 25}** In a 2020 deposition in bankruptcy court, Bates acknowledged that any documents relating to the cost and expenses of the construction of the home were in Miller's possession "because she paid for all this." He stated that he had arranged the concrete work at the property but did not pay for it. When asked if he intended to pay Classic Comfort Heating and Supply for the radiant heating system the company had installed at the home, Bates stated that he was not and that Miller "was always paying." Bates did not know the total cost of the construction project but stated that Miller "would know." He testified that Miller paid the utility bills at the home, and he only paid for internet service. Bates acknowledged that there was no written contract between him and Miller or Miller and Bates Construction LLC. Bates stated that his business practice was to provide estimate forms to customers reflecting the total cost of a project and the scope of work to be performed, and he often got half the cost up front once a proposal was accepted. As further discussed below, the majority of the construction was completed in 2019, and Bates acknowledged that when he was in contact with Classic

Comfort Heating and Supply in 2019, creditors were attempting to collect from both him and Bates Construction LLC, but he had no money at the time.

{¶ 26} The trial court found the following testimony to be relevant to its decision. Tom Harrington testified that he did the concrete work at the home. He was given $3,000 in cash by Miller and the rest of the work was done "in trade" with Bates. According to Harrington, Bates did $4,000 worth of work at Harrigton's home building a patio, for a total payment of $7,000. The bartered patio at Harrington's home was built in 2024, long after construction on Miller's home was complete.

{¶ 27} Bob Drees testified that he set rafters and purlins at the property, and Bates was his point of contact. Drees was paid $2,500 in cash by Bates. Drees did not know the source of the cash.

{¶ 28} Jason Mills testified that he hauled dirt and gravel to level the building site, and he built driveways in front of the home and going to the back of the property. Mills supplied 400 or 500 tons of gravel and dirt, and Bates operated a bulldozer to level the surface. Mills produced documentation for his work totaling $4,744.32. Mills received cash from Bates and never from Miller. In 2019, he received checks from Miller totaling $876.20 and a check from Bates. In 2020, Mills received a check from Bates Construction LLC.

{¶ 29} Jack Miller ("Jack") testified that he was paid $18 an hour as a general laborer at the property from start to finish. He identified two checks he had received from Bates Construction LLC, totaling $1,576, and nine personal checks from Bates, totaling $4,311. He did not have any records to substantiate the work he performed or any

independent recollection thereof. The checks were all issued in 2019.   Jack stated that he had received approximately $2,000 in cash from Bates and no cash from Miller.   He identified six checks from Miller totaling $2,646.   Jack was issued 1099s from Bates Construction LLC in 2019 and 2020.   Jack also testified that he bought a pickup from Bates in exchange for Jack's labor.

{¶ 30} Jim Dunlevy testified that he and Bates had swapped labor, and he did not have any record of what he had received.   Robert Hartzell testified that he sold dirt to Bates from his property for $1,600 to $1,800.

{¶ 31} Bates testified that Miller had a budget of $200,000 based upon money withdrawn from her 401(k) and the sale of her original home.   Bates did not take any notes regarding the construction of the home, maintain time records for subcontractors, or keep his own time records, because he believed he "was going to live there forever." According to Bates, Miller provided the financing, and he told her he would assist her financially when he was able.   Bates did not ask to be reimbursed by Miller during construction.   Thus, Bates had no definite obligation to assist with expenses while he was living with Miller and did not make any definite commitment to do so.   There was no agreement that Bates's name would be added to the deed or title, and Bates acknowledged that Miller never told him he could live in the home forever.   Bates described conversations with Miller and not agreements with definite terms.   Bates acknowledged that he offered his labor, the labor of others, and financial assistance when he had extra money.   Bates never invoiced Miller for his labor.

{¶ 32} According to Bates, Jack Miller, Jordan Mumaw, Larkin Painter, and Jack

Bargy were the general laborers at the property. Bates identified checks that he wrote for labor and materials during construction. The exhibits included checks from 2019 for the following: to Jake Bargy from Bates Construction LLC totaling $1,574 and from Bates totaling $666; to Jordan Mumaw from Bates Construction LLC totaling $2,641 and from Bates totaling $3,265; to Larkin Painter from Bates Construction LLC totaling $1,315 and from Bates totaling $1,510; and to Jack Miller from Bates Construction LLC totaling $1,576 and from Bates totaling $4,527. Bates estimated a value of $1,200 for Bob Dunlevy's work, and he testified that Hartzell had received $1,600 in cash for the purchase of dirt. Bates further testified regarding other miscellaneous purchases. He admitted that he did not have any records to establish the hours worked for any of the checks paid or the work performed.

{¶ 33} Bates reiterated that did not expect to be paid for his labor and "figured I'm living there." He stated that he resided at the home without paying rent for all of 2020, all of 2021, and until the eviction was filed in 2022. Bates stated that he had not expected to make any profit for his work.

{¶ 34} Bates testified that his treatment by Miller was not fair and that he should be reimbursed for materials he purchased for the property and compensated for his services as a general contractor. He estimated that he had spent 1,500 hours total working at the property, and at $30 an hour, he should receive $45,000. Alternatively, he stated that the amount allegedly due to him could be calculated at $14 per square foot for the 4,000 square foot home, with $7 per square foot going to his subcontractors and $7 for him, for a total profit of $28,000. He stated that either formula was fair. We note

that this testimony conflicted with his testimony that he did not expect to be paid or expect to receive a profit.

{¶ 35} Bates testified that he bought his personal safe when he was 20 or 21 years old, and it remained in Miller's home, built into a wall. He valued the safe at $2,100. Bates stated that he could remove the safe. He testified that a stainless steel table and some "racking" in the shop portion of the home also belonged to him, and that he and his attorney had tried unsuccessfully to remove them. According to Bates, Miller will not allow him access to the property.

{¶ 36} Bates testified that he had not intended to bestow a gift on Miller. He stated that he had received no benefit from the money and effort had had expended at the property; Miller "got the whole house and pond and land."

{¶ 37} Bates testified that Bates Construction LLC had been formed in May 2013 and dissolved in December 2019. Bates was the sole member. Bates then formed Brian Bates Construction LLC on December 31, 2019, and he was the sole member of that entity also.

{¶ 38} Miller testified that she had acquired the property in April 2019, after having dated Bates for a year. Miller stated: "[w]e didn't really talk about living together. We were just dating . . . it was just assumed that we would live together." As noted above, it was undisputed that Miller alone purchased the property on which the home was built. Miller stated that she paid for the construction cost because she was building the house that she wanted. Miller told Bates that she intended to take money from her 401(k) and sell her previous home to pay for the house, and Bates did not tell her that he had any

money to contribute. Bates told Miller that he wanted to be paid for his work for the first time when she asked him to leave the home.

{¶ 39} Miller stated that she paid for materials upon receipt of each invoice. She paid some vendors directly and gave cash to Bates to pay others. In January 2021, Miller wrote the last checks, and the majority of the work had been completed at that time, with only "punch list" and cosmetic items remaining to be done. Miller moved into the home in December 2019, while construction was ongoing. From January 2020 to January 2021, work at the home was limited to finish work and was done sporadically. According to Miller, there was nothing structural or functional that needed to be done after January 2020.

{¶ 40} Miller stated that when the work on her home began, Bates told her that, for the labor on the house, she could "write him a thousand dollar check and then pay his guys as they completed the work" at the house. She identified a check payable to Bates Construction, dated June 21, 2019, for $1,000. Miller stated the posts for the house were set in June 2019. Miller did not keep track of the laborers' hours because Bates told her what to pay them.

{¶ 41} Miller did not know how often Bates worked at the home because she was at work herself. After he moved in, he never paid rent or utilities, but he paid for the internet because Bates and his children desired an internet connection. They put their trash in a dumpster at Bates's mother's home, which was a business expense for Bates's business and was there before construction began. Miller stated that she had paid all of the living expenses at the home, and that Bates's sole contribution to the household had

been occasionally purchasing a gallon of milk. She stated that her relationship with Bates ended at least a year and a half before he eventually left the residence.

{¶ 42} Miller testified that Bates had never presented her with any of the checks or receipts discussed above prior to the litigation. Miller identified multiple pages of her checkbook reflecting the payments she made for the construction, which she relied upon to keep track of expenses. She stated that she took withdrawals from her 401(k) in the amounts of $50,000 and $49,700, and then used the profit of $74,486.10 from the sale of her home to build the house.

{¶ 43} Miller denied that Bates ever told her that he intended to live in the home forever or that he expected to be paid for any labor or materials beyond the $1,000 she gave him. Miller believed that Bates performed work at the home because he was living at the residence, they were involved in a dating relationship, and he was being nice. Miller was surprised when Bates claimed to have paid for labor and materials beyond the receipts he gave to her for reimbursement or payment; she believed she had paid for everything related to the project (as Bates testified in his 2020 deposition).

{¶ 44} Miller stated that when she asked Bates to move out, he told her he could not do so unless she gave him money to rent a place or build a place. He did not give her any sort of documentation to substantiate that he had money invested in the home. Miller stated that Bates lived in her home for 30 months without paying rent. She believed it was unfair for him to ask her for the money just because they were no longer a couple. She acknowledged that she had the benefit of Bates's safe.

1. Bates Construction LLC

**{¶ 45}** As noted above, although Bates Construction LLC was not a party to this action, the trial court nevertheless determined that payment by the LLC or payment by Bates was "basically a payment by Brian Bates," and the court included payments made by Bates Construction LLC in its order.   However, "[a] limited liability company . . . exists as an entity separate from its members and is capable of suing and being sued." *Torrance v. Rom*, 2020-Ohio-3971, ¶ 38 (8th Dist.), citing *Trickett v. Masi*, 2018-Ohio-4270, ¶ 19 (11th Dist.), citing *Disciplinary Counsel v. Kafele,* 2006-Ohio-904*,* ¶ 18; *see also Cleveland Bar Assn. v. Pearlman*, 2005-Ohio-4107, ¶ 36 (O'Donnell, J. dissenting); *Ogle v. Hocking Cty.*, 2014-Ohio-5422, ¶ 25 (4th Dist.).   " 'Thus, members of a limited liability company, even if they are the sole members of the company, do not have standing to sue on its behalf.'   *Id.,* quoting *Trickett,* citing *Ogle.*   Based on the foregoing, we conclude that, as a matter of law, Bates as an individual was not entitled to any recovery for payments that may have been made by Bates Construction LLC relating to the construction of Miller's home.   The trial court erred in holding otherwise.

### 2. Brian Bates

Expenses at the property

**{¶ 46}** In our view, the trial court's determination that Bates was entitled to payment for his services as a general contractor, for his labor, and for labor and materials allegedly purchased by him was against the manifest weight of the evidence.   If Bates believed that he should have been compensated for his services, he could have contracted with

Miller. His 2020 deposition established his knowledge and experience with the contracting process. Bates's "expectation" that he could live in the home forever, while unreasonable under any circumstance, also did not entitle him to relief, and he cannot now turn to equity for compensation because his relationship with Miller ended.

{¶ 47} Most significantly, Bates described his efforts as his "contribution" that he offered to Miller. In other words, any enrichment to Miller was the intended purpose of Bates's actions, he acted voluntarily, and Miller did not retain benefits for the expenses identified in the trial court's decision which in justice or equity belonged to Bates. Bates testified that there were no terms or agreements established by either party regarding benefits conferred by him, and he did not seek repayment until his relationship with Miller ended and he left the property. Put differently, Bates's testimony established that he did not discuss nor seek compensation from Miller until his unilateral expectation of living in the home forever was thwarted by the end of his relationship with Miller. The trial court noted in overruling Miller's Civ.R. 41(B) motion and after trial that Bates's expectation may not have been remuneration, but Bates acknowledged that Miller had never told him that he could live in the home forever. A claim of unjust enrichment cannot be based on a unilateral and unreasonable expectation, and any amounts paid by Bates were unconditional and freely given. There was no evidence of fraud, misrepresentation, or bad faith by Miller and, accordingly, there was no support for Bates's allegation that Miller caused his alleged loss. Further, the evidence established that the bulk of the construction was completed in 2019, and Bates testified in his 2020 deposition that he was without money at that time and faced bankruptcy. Bates testified at trial, however,

that the payments he made in 2019 were from "profit" from other jobs. Given that Miller had funds on hand for the total construction and that she often gave Bates cash to pay workers, the source of the money allegedly expended by Bates, particularly in light of his financial circumstances, was unclear and specious. Finally, Bates lived in the home without paying rent for 30 months, and his failure to contribute in any meaningful way, despite living in Miller's home with his children, further established that any enrichment of Miller was not unjust.

Gun Safe

**{¶ 48}** Bates testified and Miller acknowledged that the gun safe belonged to Bates. Bates was entitled to the return of the safe or its value.

**{¶ 49}** Millers first three assignments of error are sustained; the trial court erred in finding merit in Bates's claim for unjust enrichment, with the exception of the gun safe.

### D. Damages

**{¶ 50}** In Miller's fourth, fifth, and sixth assignments of error, she argues that the trial court erred in awarding damages to Bates or Bates Construction LLC on Bates's claim of unjust enrichment. For the reasons discussed under Miller's other assignments errors, we sustain these assignments of error.

## Conclusion

**{¶ 51}** Having sustained Miller's assignments of error arguing that any enrichment conferred to Miller was not unjust with the exception of Bates's gun safe, the judgment of the trial court is reversed. The matter is remanded for the court to enter judgment in

favor of Miller, except that it shall determine a remedy related to the value of Bates's gun safe, whether that be the return of the gun safe or the payment of its reasonable value.

. . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.