[Cite as *Meyer v. Lucas*, 2024-Ohio-3035.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | | |
|---|---|---|
| ANDREW MEYER | : | |
| | : | |
| Appellant | : | C.A. No. 2023-CA-21 |
| | : | |
| v. | : | Trial Court Case No. 21 CV 346 |
| | : | |
| CODI LUCAS | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 9, 2024

. . . . . . . . . . .

ROBERT W. GURRY, Attorney for Appellant

BENJAMIN D. EBERLY, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Appellant Andrew Meyer appeals from a June 12, 2023 judgment of the Miami County Court of Common Pleas, which resolved claims and counterclaims between Meyer and his former fiancée, Appellee Codi Lucas. Meyer contends that the trial court erred in awarding Lucas one-half of the increase in value of Meyer's house on

her unjust enrichment claim and in not awarding Meyer the damages he requested in his conversion claim. For the reasons that follow, we will affirm the judgment of the trial court.

I.     Facts and Course of Proceedings

{¶ 2} Meyer and Lewis lived together and were engaged to be married for almost four years. They had a significant argument that ended their engagement in late August 2021. Two months later, Meyer filed a complaint against Lucas in the Miami County Municipal Court asking the court to order Lucas to vacate their property on East Broadway Street in Covington, Ohio. Lucas filed a counterclaim requesting in excess of $15,000. Therefore, the Miami County Municipal Court transferred the case to the Miami County Court of Common Pleas pursuant to R.C. 1901.17.

{¶ 3} On December 1, 2021, Meyer filed an amended complaint alleging claims for forcible detention, replevin, and conversion. According to Meyer, Lucas took his personal property that had an approximate total value of $60,000. Lucas filed an amended answer and counterclaim in which she alleged claims for unjust enrichment and a resulting trust.

{¶ 4} A bench trial was held on March 15, 2023. Meyer and Lucas testified at trial. Meyer testified first upon cross-examination and later on direct examination. Tr. 5-53, 124-167. Meyer testified that, in 2013 or 2014, following a divorce, he began living at a house owned by his mother on East Broadway Street in Covington. Meyer started dating Lucas in October 2016, she moved in with him in 2017, he purchased an engagement

ring for her in August 2017, and they got engaged in December 2017. Meyer had two children from a prior relationship, and Lucas had three children from a prior relationship.

{¶ 5} According to Meyer, they started looking in 2018 for a house they would purchase together. Originally, the plan was for both of them to finance the house purchase, but Lucas had a problem with her credit. They ultimately decided to buy the house they were living in from Meyer's mother, who still owed about $78,000 on the house. Meyer was the only one listed on the deed, and he took out a mortgage in the amount of $132,500. Meyer testified that his mother gave them $2,500 for the down payment and that the equity his mother had built in the house was her gift to him to help make improvements on the house.

{¶ 6} Meyer testified that he and Lucas made improvements to the house after he bought it. For example, they tore out a wall in the kitchen, added a new refrigerator, and installed vinyl flooring, tile, drywall, cabinets, and countertops. They also added a new patio and fence to the property. Meyer stated that he and contractors did most of the work on the improvements to the house. He explained that Lucas had helped with the demolition of the kitchen but had not provided much other assistance. Meyer also stated that Lucas had not assisted him with his business as an owner-operator truck driver.

{¶ 7} Meyer agreed that he and Lucas had set up a joint bank account in September 2018 and that most of the monthly bills, including the mortgage payment, were paid from that joint account. Meyer believed that he had contributed much more to the bank account than Lucas. However, he conceded that Lucas had been contributing to joint finances for at least eight months prior to the home purchase.

**{¶ 8}** In late August 2021, Lucas and Meyer had a significant argument that ended their romantic relationship and engagement. Meyer testified that Lucas took much of his personal property, which he had either purchased before he met her or had purchased after they were dating but had financed solely in his name. He presented a list of items to the court that he believed were his property and that she had converted. Meyer estimated how much these used items were worth based primarily on searches he had done on internet websites for similar products that were brand new. Meyer did not present documentary evidence supporting the "replacement" values to which he testified.

**{¶ 9}** After they broke up, Meyer removed a substantial amount of money from the joint bank account. Meyer also obtained an ex parte civil protection order against Lucas, which led to her being removed from the property on East Broadway Street. However, after a hearing, the domestic relations court dissolved the protection order, and Lucas eventually moved back into the house until February 2022. According to Meyer, he did not live at the home during that time but paid all the expenses.

**{¶ 10}** Meyer believed that Lucas should not receive any equity in the house, because her name was not on the mortgage or deed and she received use of the house when she lived there. Further, he believed she should not get any portion of the amounts received from the sale of personal property, because she stole several items of property from him.

**{¶ 11}** Lucas testified next. Tr. 53-122. She testified that she began dating Meyer in 2016, and they had shared their finances from September 2018 to September 2021. Prior to when they combined their finances in September 2018, Lucas had given

Meyer approximately $5,000 toward the purchase of a bass boat and helped him with groceries, bills, and household expenses. She contributed an initial $2,000 to their joint account in September 2018 and then began having both her employment and unemployment income deposited into that account. Lucas noted the following improvements that they had made to the house: (1) remodeled the kitchen by knocking down a wall that connected the living room and kitchen and replacing the flooring, cabinets, and countertops; (2) added a patio, a stone fireplace, some sod, and fencing; (3) added drywall in the living room along with a fireplace and a wall television; (4) remodeled the attic so that there were two bedrooms on that level; (5) added new sidewalks to go from the front to the side of the house; and (6) added a new concrete driveway. When asked to explain how she helped contribute to the improvements other than through the payments made out of the joint bank account, Lucas stated:

> We knocked down the wall; we tore that all out; gutted the complete kitchen; outside we helped with framing, you know, getting the concrete slab ready to go. At that point it was like handing tools because we also had friends over helping us. The fencing we dug holes; put holes in outside; we had a buddy come out and help us with the sidewalk; framing of that; and the fence.

Tr. 60.

{¶ 12} After their relationship and engagement ended, Lucas was forced out of the house and spent two weeks in a hotel that was reserved through her church. She eventually was allowed to live in the house for an additional five months, during which

time she paid for cable and took care of the dogs.

{¶ 13} According to Lucas, prior to their break-up, Meyer and Lucas had talked about how they would divide their property if they broke up; Meyer had said she could take several items, and so she did. Lucas testified that she would be willing to return some items if Meyer asked for them. She also explained what property she had sold and how much money she had received from the sales. Immediately after they ended the engagement, Meyer took $7,628.55 of the $10,148.10 that was in their joint checking account. Lucas also believed he took approximately $5,000 from their joint savings account. Lucas testified that Meyer agreed to pay off the rest of the bills.

{¶ 14} On June 12, 2023, the trial court issued its decision and judgment entry. The court found that "Meyer was not credible for multiple reasons." Decision, p. 5. First, the court noted that Meyer testified that Lucas should receive nothing on her counterclaim because she "did nothing," despite the fact that she had lived with him for nearly four years, had been engaged to him, and had helped purchase a home and improve the home with funds that came from a joint account. Second, Meyer did not offer values for many used items, instead opting to seek current retail values of new versions of the property, despite conceding that some of the property had been purchased in used condition for much less than the values he sought at trial. Third, Meyer's testimony was contradicted by some of his text messages. Fourth, the trial court stated that it "found no credibility throughout Meyer's testimony." Id. at 5-6.

{¶ 15} On the other hand, the trial court found Lucas to be credible and noted that she "not only testified that she assisted in the home improvements, she confirmed that

those expenses, along with mortgage payments and other household expenses and purchases, were paid from the joint account." *Id.* at 7-8. Further, "[s]he stated that both Parties deposited their paychecks into the joint account, although some of her checks were unemployment checks after she lost her job." *Id.* at 8. The trial court also pointed out that "[i]n furtherance of Lucas' credibility, at the point of separation, Lucas was unemployed, had no vehicle as Meyer retrieved it, and no place to live (a church put her in a hotel for two weeks), and yet did not take any cash that was readily available to her either from the safe or withdraw money from the joint accounts." *Id.*

{¶ 16} The trial court noted that both Lucas and Meyer had children from prior marriages, and they had remodeled the home from three bedrooms to five bedrooms for the children. According to the court, "[t]hey had dreams of a life together, worked to improve the home, and contributed equally to the mortgage and improvements. Lucas testified she put 'sweat' into the house." *Id.* at 8-9. The trial court found that Lucas's testimony was credible and "[t]he weight of the evidence at trial favors Lucas." *Id.* at 9.

{¶ 17} Although the trial court stated that the credibility determinations and weight of the evidence favored Lucas, the court acknowledged that its resolution of the property interests at issue was "hampered by a lack of documentary evidence." *Id.* The trial court found that Lucas had proved Meyer was enriched by her mortgage payments and her payments of other household bills from the joint Wright-Patt account as well as her contributions to home improvements. The court then noted the parties stipulated that the real property's fair market value as of trial was $172,786, which was a gain of $37,786.00 in the property's value since the house was purchased from Meyer's mother.

The court found that Lucas was entitled to one-half of the increase in value, or $18,893.00. *Id.* at 14.

{¶ 18} Based on its review of the trial testimony and evidence submitted at trial, the court found that Lucas owed Meyer $150 from the sale of a kitchen table and six chairs; $750 for a hot tub; and $1,000 for a Sleep Number Bed. The court also ordered Lucas to return an IKEA wardrobe and 12 geese decoys plus $8, or pay $200 and keep the decoys. This resulted in a total monetary amount of $1,908 or $2,100 owed by Lucas to Meyer. The court also found that Meyer owed Lucas $2,554.50 from the Wright-Patt "Truesaver" savings account; $3,458.79 from the Wright-Patt checking account; $18,893 from the equity in the property; $1,950 from the bass boat sale; and $1,000 for the down payment on the truck for the business. This resulted in a total monetary amount of $27,856.29 owed by Meyer to Lucas.

{¶ 19} Meyer filed a timely notice of appeal from the trial court's judgment.

II.     The Trial Court's Judgment Was Not Against the Manifest Weight of the Evidence

{¶ 20} Meyer's sole assignment of error states:

The Trial Court erred as a matter of law in granting judgment to Ms. Lucas for half the equity in the house, and for the personal property items, by failing to correctly state or apply Ohio law of unjust enrichment and restitution, or supporting a finding that Mr. Meyer retained some unjust benefit.

{¶ 21} Generally, Meyer contends that the trial court erred by concluding that Meyer was unjustly enriched and that he failed to provide adequate evidence of the value of the personal property Lucas converted. Meyer argues that the only benefit the trial court could have found that Lucas conferred on Meyer was her deposits of money into the parties' joint bank account. According to Meyer, Lucas only deposited between $100,000 and $110,000 into the joint account, while he deposited at least $240,000 into the joint account. As a result, Meyer believes it would not have been "unjust" to allow Meyer to keep the entire increase in the value of the house between the time he bought it and the end of the engagement, regardless of how much Lucas had assisted him in making improvements to the house after it was purchased from his mother.

{¶ 22} Meyer asks us to review the trial court's judgment under a de novo standard of review. Appellant's Brief, p. 8-9. But that is not the appropriate standard in this appeal from a bench trial. "When reviewing civil appeals from bench trials, we apply a manifest-weight standard of review." *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.*, 2011-Ohio-1922, ¶ 5 (8th Dist.), citing App.R. 12(C) and *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis in original.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Id.* In determining whether a verdict is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences,

considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20.

{¶ 23} When a court of appeals determines that a verdict is against the weight of the evidence, it should remand the cause for a new trial. *Id.* at ¶ 22, citing *Hanna v. Wagner*, 39 Ohio St.2d 64, 66 (1974). The discretionary power of an appellate court to grant a new trial is to be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387. We make every reasonable presumption in favor of the judgment and any finding of fact; if the evidence is susceptible to more than one construction, we are bound to interpret it in the way that is consistent with the judgment. *Eastley* at ¶ 21, citing *Seasons Coal Co.* at 80, fn. 3.

{¶ 24} "Ohio law does not have any provision for allocating property among unmarried, cohabiting individuals." *Hatten v. Shaw*, 2000 WL 670305, *2 (4th Dist. May 15, 2000), citing *Lauper v. Harold*, 23 Ohio App.3d 168, 170 (12th Dist. 1985). Further, Ohio's "heart balm" statute, R.C. 2305.29, provides, in part, "[n]o person shall be liable in civil damages for any breach of a promise to marry . . ." However, this does not mean that the trial court was without authority to make an award in a situation like the one in which Meyer and Lucas found themselves. "[W]hile R.C. 2305.29 prohibits the recovery of civil damages based on a broken promise of marriage, the statute does not preclude the recovery of property which was transferred in reliance on a promise to marry." *Dixon v. Smith*, 119 Ohio App.3d 308, 315 (3d Dist. 1997), citing *Wilson v. Dabo*,

10 Ohio App.3d 169 (10th Dist. 1983). Requiring fulfillment of an equitable duty to restore Lucas to the position she was in prior to the agreement to marry " 'does not constitute an award of damages for breach of promise to marry but is an order for restitution of property to which the reneging party no longer has a right, having relinquished it by exercising the statutory prerogative to terminate the promise to marry.' " *Id.* at 315-316, quoting *Dabo* at 170-171. "Therefore, the recovery of property transferred in reliance on a promise to marry is permitted upon the equitable theory of preventing unjust enrichment." *Id.* at 316.

{¶ 25} Quantum meruit or unjust enrichment is "an equitable remedy 'giving rise to obligations imposed by law, irrespective of the intentions of the parties, in order to prevent an injustice when one party retains a benefit from another's labors.' " *In re Suchodolski*, 2011-Ohio-6333, ¶ 8 (9th Dist.), citing *In re Estate of Kirkland*, 2008-Ohio-421, ¶ 23 (2d Dist.). "Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another . . .' " *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 20, quoting *Hummel v. Hummel*, 133 Ohio St. 520, 528 (1938). "The elements of unjust enrichment include: 1) a benefit conferred by a plaintiff upon a defendant; 2) knowledge by the defendant of the benefit; and 3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." (Citations omitted.) *Harco Industries, Inc. v. Elco Textron, Inc.*, 2003-Ohio-2397, ¶ 14 (2d Dist.). "Unjust enrichment is an equitable claim based on a contract implied in law, . . . the purpose of which 'is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant.' "

(Citations omitted.)  *Bunta v. Superior VacuPress, L.L.C.*, 2022-Ohio-4363, ¶ 36.

{¶ 26} Lucas met her burden of proving the elements of unjust enrichment.  She conferred a substantial benefit on Meyer.  She deposited money into their joint bank account that was used to pay the mortgage on the house and household expenses, and she assisted Meyer in remodeling many aspects of the inside and outside of the house. While Meyer attempted at trial to discount all of Lucas's efforts in these regards, the trial court found that Meyer was not credible and Lucas was credible.  It is well established that "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."  *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.  We defer to the trial court's credibility determinations, because it is "best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony."  *Seasons Coal Co.*, 10 Ohio St.3d at 80.  "A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it." (Citation omitted.)  *State v. Fetty*, 2012-Ohio-6127, ¶ 58 (11th Dist.).

{¶ 27} Meyer contends that "[n]o evidence other than Ms. Lucas's post-hoc feelings, was presented to suggest, much less met her burden to show, any gifts or transfers of property were made 'in contemplation of marriage,' rather than due to the parties being in a relationship generally, or to mere cohabitation."  Appellant's Brief, p. 10.  As Meyer appears to concede when referencing Lucas's "post-hoc feelings," Lucas's testimony supported the trial court's findings.  Further, the actions of the parties in combining their money, getting engaged, and putting a great amount of sweat equity into

the house in which they planned to raise their respective children supported the trial court's findings. Indeed, the parties both testified that the plan was for both of them to be on the deed and own the house before they discovered that Lucas's poor credit history prevented her from being on the mortgage. Although the parties were never legally married, they were engaged to be married, and Lucas was clearly conferring benefits on Meyer based on this promise to marry. As the trial court noted, they remodeled the house in ways that suggested they intended to make it a home for themselves and their children. Despite this, Meyer contends that Lucas was not entitled to any damages because she received the benefit of living in his house as the value of the house increased. But Meyer, unlike Lucas, will continue to enjoy the benefits of all of Lucas's efforts in remodeling the house, making payments toward the mortgage, and making payments toward household expenses. As the Third District has explained:

> When Karen left the residence, Harold retained many benefits from her $18,750 contribution. Not only did the value of his home substantially increase, but Harold also benefited by continuing to live in an improved home with two additional bedrooms and one additional bathroom. It is clear that it would be unjust to permit defendant to retain these benefits without restitution to the plaintiff for the funds that made those improvements possible.

*Dixon*, 119 Ohio App.3d at 318. *See also Sigrist v. Lyons*, 100 Ohio App.3d 252, 254 (10th Dist. 1995) (affirming an award of damages for unjust enrichment where the plaintiff previously had provided funds to her ex-fiancé to help him purchase a house that was

intended to be their marital residence).

**{¶ 28}** We do not take lightly the fact that there is no provision in Ohio's statutes for the division of property between unmarried couples. And the law of unjust enrichment will not always provide relief when engaged couples call off their engagement and have disputes over property. But the specific facts in the record before us support the trial court's decision to award Lucas one-half of the increase in value of Meyer's house. Based on this record, we cannot conclude that the trial court's judgment on Lucas's unjust enrichment claim was against the manifest weight of the evidence.

**{¶ 29}** Finally, Meyer contends that the trial court incorrectly denied his request for damages for conversion of many of his personal property items due to the lack of documented fair market value and the fact that he had access to the personal property before Lucas took it. According to Meyer, "Ohio law has long recognized that an owner of either real or personal property is, by virtue of such ownership, competent to testify as to the market value of the property. . . . There was adequate testimony from Mr. Meyer to appropriately value the wrongfully converted property." Appellant's Brief, p. 25.

**{¶ 30}** The elements of a conversion claim are (1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *Haul Transport of VA., Inc. v. Morgan*, 1995 WL 328995, *3 (2d Dist. June 2, 1995). Conversion is "any distinct act of dominion wrongfully exerted over one's property in denial of his rights or inconsistent with it." (Citation omitted.) *Schiff v. Dickson*, 2011-Ohio-6079, ¶ 30 (8th Dist.).

{¶ 31} In a conversion claim, the general rule for the measure of damages is the value of the property at the time of conversion. *Erie RR. Co. v. Steinberg*, 94 Ohio St. 189 (1916), paragraph two of the syllabus. "[A] person generally must be qualified as an expert in order to testify as to the value of property." (Citations omitted.) *Carpenter v. Johnson*, 2011-Ohio-4867, ¶ 16 (2d Dist.). An exception exists for owners of personal property, because the owner, "aided by his experience, has some particular means of forming an intelligent and correct judgment as to the value of the property in question beyond that which is possessed by people generally." *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 627 (1992).

{¶ 32} Meyer did not testify about what he believed the market value of the property was immediately before conversion. Rather, his testimony was a combination of what he paid for some of the items when he first got them and what it would cost to replace the converted items with new versions of the items. The original price paid for personal property several years before the conversion does not establish the market value immediately before the time of conversion. *Werr v. Moccabee*, 2008-Ohio-595, ¶ 10 (4th Dist.). Similarly, testifying about what a website shows is the price of a brand-new piece of personal property to replace the old personal property that was converted does not establish the market value of the old property immediately before the conversion.

{¶ 33} In short, Meyer's testimony on damages was speculative at best. He testified that many of the items were purchased many years ago, and he often did not know the purchase price. He estimated the value of many of his items by looking on websites on the internet that contained what he believed to be comparable items, and

then he assigned a value to his items based on prices he found on such websites for brand new versions of these items. However, none of the out-of-court materials Meyer purportedly relied upon for his fair market value figures were introduced into evidence. This precluded any meaningful scrutiny of the relied-upon listings, their valuations, or their alleged comparable nature and condition relative to the items for which Meyer sought damages. *Kavalec v. Ohio Express, Inc.*, 2016-Ohio-5925, ¶ 39-40 (8th Dist.). This is not an instance where damages were substantiated by entering into evidence documents relating to online research of comparable items. *See, e.g., State v. Hollowell*, 2014-Ohio-1142, ¶ 34 (6th Dist.) (the testimony of the witnesses along with evidence of online price research for comparable items served as competent, credible evidence that allowed the court to discern the price of the items to a reasonable degree of certainty).

**{¶ 34}** Meyer's failure to submit documentation to support his out-of-court valuation research precluded Lucas from any fair opportunity to challenge the outside materials as well as any ability to challenge the comparable nature of the items sought to the items found on the internet. Therefore, the trial court properly rejected Meyer's speculative and unsupported testimony regarding the value of the allegedly converted personal property. The trial court's judgment on Meyer's conversion claim was not against the manifest weight of the evidence.

**{¶ 35}** The sole assignment of error is overruled.

III.    Conclusion

**{¶ 36}** Having overruled Meyer's sole assignment of error, the judgment of the trial

court will be affirmed.

. . . . . . . . . . . . .


HUFFMAN, J., concurs.

TUCKER, J., dissents:

{¶ 37} I respectfully dissent from that portion of the majority opinion which concludes that the trial court's judgment awarding Lucas one-half of the increased value of the home, or $18,893, was not against the manifest weight of the evidence. In my opinion, awarding Lucas one-half of the increased value of the home did not represent an unjust enrichment award but was, instead, an improper division of property between an unmarried, cohabitating couple. As such, the $18,893.00 judgment should, in my view, be reversed as a matter of law.

{¶ 38} I agree that unjust enrichment can be the basis for an award when an identified and traceable sum of money is transferred from one party to another party in contemplation of marriage, and, upon a break-up, it would be unjust for the receiving party to retain the money. *Sigrist,* 100 Ohio App.3d 252*; Dixon,* 119 Ohio App.3d 308.

{¶ 39} In *Sigrist,* Sigrist, during her engagement to Lyons, transferred $4,920 to Lyons so that he "would qualify for FHA financing on the house where the parties were to live." *Sigrist* at 254. When the engagement ended, Sigrist demanded the return of the $4,920; the demand was refused, Sigrist filed a cause of action, and the trial court granted Sigrist judgment in the amount of $4,920. *Id.* The appellate court affirmed the judgment under an unjust enrichment rationale, stating that the trial court could have reasonably

found "that the transfer of funds was based on an understanding that at the time of the transfer, the parties intended to marry. Because the parties did not marry . . . Sigrist was entitled to have her money returned." *Id.*

{¶ 40} In *Dixon,* Dixon moved into Smith's home while engaged to him, and the parties began to commingle their funds shortly thereafter. Dixon then obtained an $18,750 mortgage on a rental property she owned. This amount was deposited into the parties' joint checking account and, over the next year, the entire amount was exclusively used to make improvements to Smith's home. The engagement ended, and Dixon filed suit; she demanded, among other things, an unjust enrichment award in the amount of $18,750. Following a bench trial, the trial court awarded Dixon $18,750. The appellate court affirmed the judgment. Though the appellate court's rationale with respect to unjust enrichment was not precisely stated, it is fair to say the appellate court found that the evidence supported Dixon's assertion that she had transferred the funds in contemplation of marriage and, when the marriage did not occur, it would have been unjust to permit Smith to retain benefits of the home improvements without restitution to Dixon of the $18,750 that made the improvements possible. *Dixon* at 318.

{¶ 41} These cases represent proper unjust enrichment analyses. In each case, there was a transfer of identifiable and traceable funds and, upon the break-up, there would have been an obvious injustice to allow the receiving party to retain the funds or, without restitution, the benefit the funds provided.

{¶ 42} This is in sharp contrast to the case before us. Lucas did deposit money into the parties' joint bank account, and those funds assisted in the payment of the

mortgage and other household expenses. Further, she did assist in remodeling the home. Whether there was an engagement or not, this is the type of conduct engaged in by countless unmarried, cohabitating couples. But upon a break-up, such conduct does not allow a property division award couched in the language of unjust enrichment. By awarding Lucas one-half of the home's increased value -- a quintessential property division award – the trial court fashioned an improper property division using the language of unjust enrichment. On this basis, I respectfully dissent from the majority opinion.